1    XAVIER BECERRA
     Attorney General of California
2    GARY E. TAVETIAN, SBN 117135
     DAVID A. ZONANA, SBN 196029
3    Supervising Deputy Attorneys General
     ELIZABETH B. RUMSEY, SBN 257908
4    JULIA K. FORGIE, SBN 304701
     Deputy Attorneys General
5      1515 Clay Street, 20th Floor
       P.O. Box 70550
6      Oakland, CA  94612-0550
       Telephone:  (510) 879-0860
7      E-mail:  Liz.Rumsey@doj.ca.gov
     *For the State of California, by and through Attorney*
8    *General Xavier Becerra and the California Air*
     *Resources Board*
9
     *Additional Parties and Counsel Listed on Signature*
10   *Page*

11                  IN THE UNITED STATES DISTRICT COURT

12              FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14   ┌─────────────────────────────────────┬──────────────────────────────
     The STATE OF CALIFORNIA, by and through     CASE NO._____
15   Attorney General Xavier Becerra and the
     CALIFORNIA AIR RESOURCES BOARD;
16   the STATE OF ILLINOIS; the STATE OF
     MARYLAND; the STATE OF NEW MEXICO;     STATES' COMPLAINT FOR
17   the STATE OF OREGON; the               DECLARATORY AND INJUNCTIVE
     COMMONWEALTH OF PENNSYLVANIA;          RELIEF
18   the STATE OF RHODE ISLAND; and the
     STATE OF VERMONT,                      (Clean Air Act, 42 U.S.C. § 7604)
19
                              Plaintiffs,
20
            v.
21

22   UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY; and SCOTT
23   PRUITT, Administrator, U.S. EPA,

24                            Defendants.
     └─────────────────────────────────────┴──────────────────────────────
25

26

27

28

                                    1

**INTRODUCTION**

1.       Plaintiffs the State of California, by and through the Attorney General and the California Air Resources Board; the State of Illinois; the State of Maryland; the State of New Mexico; the State of Oregon; the Commonwealth of Pennsylvania; the State of Rhode Island, and the State of Vermont (Plaintiffs) bring this action under the citizen suit provision of the Clean Air Act (42 U.S.C. § 7604(a)(2)) to compel the United States Environmental Protection Agency (Defendant or EPA) to fulfill its statutory duty to implement and enforce the *Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills*[1] (Emission Guidelines).

2.       EPA promulgated the Emission Guidelines concurrently with a rule for new sources, *2016 Standards of Performance for Municipal Solid Waste Landfills*[2] (New Source Performance Standards, and together, Landfill Emission Rules). The Landfill Emission Rules aim to control emissions of volatile organic compounds, hazardous air pollutants, carbon dioxide, and methane from municipal solid waste landfills (landfills). These pollutants present a range of significant public health and safety concerns. For one, landfills are the third largest source of anthropogenic methane emissions in the United States. EPA has acknowledged that methane is a potent greenhouse gas and thus a significant driver of climate change. When it promulgated the Landfill Emission Rules, EPA asserted that the pollution reductions achieved by the Rules "will improve air quality and reduce the potential for public health and welfare effects associated with exposure to landfill gas emissions." 81 Fed. Reg. at 59,276.

3.       After completing the comprehensive notice-and-comment rulemaking process, EPA issued the final Landfill Emission Rules on August 29, 2016. On October 28, 2016, the Emission Guidelines went into effect, including an implementation schedule that would have required landfill owners/operators to install control systems within 30 months of determining that the rule's emission threshold has been exceeded. But instead of working to support and ensure compliance with the Emission Guidelines, EPA has worked to undermine them—for example, by

---

[1] 81 Fed. Reg. 59276 (Aug. 29, 2016). Docket No. EPA-HQ-OAR-2014-0451. *See* 40 CFR Part 60, Subpart Cf.
[2] 81 Fed. Reg. 59332 (Aug. 29, 2016). Docket No. EPA-HQ-OAR-2003-0215. *See* 40 CFR Part 60, Subpart XXX.

communicating that it has no intent to respond to state plans or to impose a federal plan on states that did not impose a state plan—in clear derogation of its statutory and regulatory duties.

4.     EPA's violation of legal mandates in this case is plain: Under the Emission Guidelines, states were required to submit implementation plans by May 30, 2017. 40 C.F.R. § 60.30f(b). Pursuant to its own regulations, EPA had four months from that date to approve or disapprove any submitted state plans and six months to impose a federal plan on noncomplying states. Therefore, by September 30, 2017, EPA was legally required to respond to states that had timely submitted plans (40 C.F.R. § 60.27(b)), and by November 30, 2017, EPA was legally required to impose a federal plan on noncomplying states. 40 C.F.R. § 60.27(d). It failed to do either (and has conceded as much in pleadings filed in *Natural Resources Defense Council v. EPA*, 2018 WL 105266. This constitutes an actionable violation under the Clean Air Act. *See, e.g.*, *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 552-53 (D.D.C. 2005) (failure to perform mandatory duty arising out of regulation constitutes violation of Clean Air Act).

5.     Accordingly, Plaintiffs seek a declaration that EPA's actions and inactions have violated the Clean Air Act, and a mandatory injunction requiring EPA to immediately implement and enforce the Emission Guidelines.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), which authorizes any person (including states, *see* 42 U.S.C. § 7602(e)), after duly giving notice, to commence an action in district court to compel the Administrator to perform an act or duty which is not discretionary. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiffs), and 5 U.S.C. §§ 701–06 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is the judicial district in which two of the Plaintiffs, the State of California and the California Air

1   Resources Board, reside, and this action seeks relief against federal agencies and officials acting

2   in their official capacities.

3                                          **NOTICE**

4       8.      On March 23, 2018, Plaintiffs sent EPA a notice of intent to sue for EPA's failure to

5   enforce the Emission Guidelines. The letter provided the requisite 60-day notice for an action to

6   compel the Administrator to perform a non-discretionary act or duty under Section 304(a). 42

7   U.S.C. § 7604(a)(2).

8       9.      More than 60 days have passed since the Plaintiffs sent the notice letter, and EPA still

9   has not taken mandatory steps to implement and enforce the Emission Guidelines.

10                                         **PARTIES**

11      10.     Plaintiff STATE OF CALIFORNIA brings this action by and through Attorney

12  General Xavier Becerra and the California Air Resources Board. The Attorney General is the

13  chief law officer of the State (Cal. Const., art. V, § 13), and is authorized to file civil suits that

14  either directly involve the State's rights and interests or that are deemed necessary by the

15  Attorney General to protect public rights and interests. Cal. Gov. Code §§ 12600–12; *Pierce v.*

16  *Superior Court*, 1 Cal. 2d 759, 761–62 (1934). This challenge is brought pursuant to the Attorney

17  General's independent constitutional, statutory, and common law authority to bring suit and

18  obtain relief on behalf of the State of California.

19      11.     The CALIFORNIA AIR RESOURCES BOARD (CARB) is a public agency of the

20  State of California within the California Environmental Protection Agency. The mission of

21  CARB is to promote and protect public health, welfare, and ecological resources of California's

22  citizens through the monitoring and protection of air quality. CARB's major goals include

23  providing safe, clean air to all Californians, reducing California's emission of greenhouse gases,

24  and providing leadership and innovative approaches for implementing air pollution controls.

25  CARB is the agency responsible for ensuring California's compliance with the regulations at

26  issue here. In addition to developing statewide rules, CARB works with local California air

27  districts, many of which regulate landfills at the local level. This action is brought, in part, by the

28  Attorney General at the request of CARB and in the name of the State of California.

12.     Plaintiff STATE OF ILLINOIS brings this action by and through Attorney General Lisa Madigan. The Attorney General is the chief legal officer of the State of Illinois (Ill. Const., art. V, § 15), and "has the prerogative of conducting legal affairs for the State." *Envtl. Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (1977). She has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (1992).

13.     Plaintiff STATE OF MARYLAND brings this action by and through Attorney General Brian E. Frosh. The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents with respect to, among other things, protecting the natural resources and environment of the State. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1, § 7.

14.     Plaintiff STATE OF NEW MEXICO brings this action by and through Attorney General Hector Balderas. The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action.  N.M. Stat. Ann. § 8-5-2.

15.     Plaintiff STATE OF OREGON is a sovereign entity that brings this action, by and through Attorney General Ellen F. Rosenblum, on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State. The Attorney General is the chief law officer of the State (Or. Rev. Stat. § 180.210), and is authorized to file civil suits when deemed necessary by the Attorney General to protect the state's interests and when requested by any state officer. Or. Rev. Stat. § 180.060(1)(d). The Director of the Oregon Department of Environmental Quality is a state officer charged with leading that agency and administering and enforcing environmental laws in Oregon (Or. Rev. Stat. § 468.045(1)), and has requested the Attorney General to bring this action.

16.     Plaintiff COMMONWEALTH OF PENNSYLVANIA brings this action by and through Attorney General Josh Shapiro and the Pennsylvania Department of Environmental Protection to protect its own sovereign and proprietary rights and the rights of its citizens. Under the Pennsylvania Constitution, the citizens of the Commonwealth "have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." Pa. Const., art. I, § 27. The Attorney General is "the chief law officer of the Commonwealth," Pa. Const., art. IV, § 4.1, and is authorized to bring this action on behalf of the Commonwealth pursuant to his statutory authority under 71 P.S. § 732-204.

17.     Plaintiff STATE OF RHODE ISLAND brings this action by and through Attorney General Peter F. Kilmartin. The Attorney General has all the sovereign powers and duties as founded in the common law and established in Article IX, Section 12 of the Rhode Island Constitution, and by statute. The Attorney General, therefore, has the common law power to institute, conduct, and maintain all such actions and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public right. *See Suitor v. Nugent*, 98 R.I. 56, 58, 199 A.2d 722 (1964).

18.     Plaintiff STATE OF VERMONT brings this action by and through Attorney General Thomas J. Donovan, Jr. The Attorney General is authorized to represent the State in civil suits involving the State's interests, when, in his judgment, the interests of the State so require. 3 V.S.A. Ch. 7.

19.     Each of the plaintiffs is a "person" as defined in Section 302(e) of the Clean Air Act (42 U.S.C. § 7602(e)), for purposes of bringing suit under Section 304.

20.     Defendant EPA is an executive agency of the federal government charged with protecting human health and the environment, which includes implementing and enforcing the Clean Air Act in coordination with the states.

21.     Defendant E. Scott Pruitt is the Administrator of the EPA. The Administrator is charged with implementing and enforcing the Clean Air Act, including the nondiscretionary requirement in Section 111(d), 42 U.S.C. § 7411(d), and implementing regulations to establish and enforce guidelines to limit emissions of any non-criteria and non-hazardous air pollutants

6

from existing sources in a source category when EPA establishes standards of performance for emissions of air pollutants from new sources in the source category under Section 111(b).

**STATUTORY AND REGULATORY FRAMEWORK**

## I. THE CLEAN AIR ACT

22.    The Clean Air Act requires EPA to regulate all categories of stationary sources that cause or contribute significantly to air pollution that may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. § 7411(b)(1)(A). For each category, EPA must prescribe federal "standards of performance" under Section 111(b) for emissions of pollutants from new or modified sources (new source performance standards, or NSPS). 42 U.S.C. § 7411(b)(1)(B). Section 111(b) further requires EPA to review and if appropriate revise those standards at least every eight years. *Id*. EPA sets NSPS by reference to emissions levels that can be achieved using the most up-to-date control technology that is both feasible and cost-effective for each type of pollutant, but the agency does not mandate the use of any specific equipment or technology. 42 U.S.C. §§ 7411(a)(1), (b)(5).

23.    When EPA establishes performance standards for emissions of air pollutants from new sources in a particular source category under Section 111(b), Section 111(d) and applicable regulations direct the agency to publish guidelines for controlling emissions from *existing* sources in that source category, except where those emissions are covered under certain other Clean Air Act programs. 42 U.S.C. § 7411(d)(1). EPA's regulations provide that such emission guidelines will be issued "[c]oncurrently upon or after proposal of [Section 111(b)] standards of performance for the control of a designated pollutant from affected facilities." 40 C.F.R. § 60.22(a).

24.    Under EPA's regulations implementing Sections 111(b) and (d) (40 C.F.R., Subpart B), states must submit to EPA an implementation plan within nine months of the promulgation of an emission guideline, unless the emission guideline specifies a different submission deadline. 40 C.F.R. § 60.23(a)(1). EPA must approve or disapprove a state's plan within four months after the submission deadline. *Id*. § 60.27(b). If a state fails to submit a plan, EPA must promulgate a federal plan within six months after the submission deadline. *Id*. § 60.27(d).

7

25.     The Clean Air Act also addresses agency rulemakings under the Clean Air Act, and opportunities for administrative and judicial review. Of relevance here, Section 307(d)(7)(B) provides for mandatory administrative reconsideration of a rule where the party seeking reconsideration can demonstrate (1) that it was "impracticable" to raise its objection to the proposed rule during the public comment period or that the grounds for the objection arose after the period for public comment; and (2) that the objection "is of central relevance to the outcome of the rule … ." 42 U.S.C. § 7607(d)(7)(B). Section 307(d)(7)(B) authorizes EPA's Administrator to postpone a rule's effectiveness "for a period *not to exceed three months*" during such reconsideration, but the statute is clear that reconsideration shall not otherwise postpone the effectiveness of the rule. *Id.* (emphasis added); *see also id.* § 7607(b)(1) ("The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action . . . shall not postpone the effectiveness of such rule or action.").

26.     There is no other legal basis for a stay of a rule once it has gone into effect. To stay a rule is tantamount to amending or revoking it. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017); *see also Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) ("an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked"). Promulgated rules thus remain valid and *in effect* unless and until they are revised through the Clean Air Act's enhanced rulemaking procedures. *See* 42 U.S.C. § 7607(d)(1)–(6). Those procedures do not allow EPA to stay or suspend an existing rule during a rulemaking to modify or repeal it. *See Natural Res. Def. Council v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992) ("[B]oth the language and the purpose" of the Clean Air Act "preclude the authority claimed by the EPA to stay the effectiveness of the standards.").

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  LANDFILL EMISSIONS

27.     The United States produces roughly 265 million tons of solid waste annually, or 4.5 pounds per person, per day – more than any other country per capita. Eighty percent of that waste is disposed of in landfills; the remaining twenty percent is incinerated.

8

28.     Solid waste landfills emit a number of harmful pollutants, including volatile organic compounds, hazardous air pollutants, and greenhouse gases, including methane and carbon dioxide. These emissions present a range of public health and safety concerns.

29.     Methane, for one, is a potent greenhouse gas. According to EPA, methane is the second leading climate-forcing agent after carbon dioxide globally. Pound for pound, it warms the climate 28 to 36 times more over a 100-year time frame and roughly 86 times more over a 20-year time frame than carbon dioxide. 81 Fed. Reg. 59281. EPA further reports that landfills are the third-largest source of human-related methane emissions in the United States, accounting for approximately 18.2 percent of national methane emissions in 2014. *Id.*

30.     In December 2009, EPA determined that greenhouse gases endanger public health and welfare because of their contribution to climate change. 74 Fed. Reg. 66,496 (Dec. 15, 2009). EPA has also found that methane specifically "contributes to warming of the atmosphere, which, over time, leads to increased air and ocean temperatures, changes in precipitation patterns, melting and thawing of global glaciers and ice, increasingly severe weather events, such as hurricanes of greater intensity and sea level rise." 77 Fed. Reg. 49,490, 49,535 (Aug. 16, 2012).

31.     Methane emissions from landfills harm Plaintiffs and their citizens by significantly contributing to air pollution that causes climate change. *See Massachusetts v. EPA*, 549 U.S. 497, 521 (2007). Plaintiffs and their citizens have experienced and will continue to experience injuries from climate change, including, but not limited to:

    a.     increased incidence of heat deaths and illnesses due to intensified and prolonged heat waves;

    b.     increased incidence of ground-level ozone pollution, with concomitant increases in asthma, bronchitis, heart disease, and emphysema, as well as coughing, throat irritation, and lung tissue damage;

    c.     beach erosion, temporary and permanent inundation of portions of coastal state property, damage to publicly owned coastal facilities and infrastructure, and salinization of water supplies from accelerated sea level rise;

d.      more frequent flooding from more severe rains and higher storm surges resulting in property damage and hazard to human safety;

e.      diminished water supplies and adverse impacts to agriculture due to reduced snowpack and more frequent and severe droughts;

f.      deaths, property damage, and impairment of air and water quality from increasingly more severe and damaging wildfires;

g.      additional state emergency response costs caused by more frequent and intense storm surges, floods, and wildfires; and

h.      widespread loss of species and biodiversity, including the disappearance of hardwood forests from the northern United States.

32.     These impacts are inflicting substantial social and economic costs on all Plaintiffs. For one, the adverse health impacts attributable to rising temperatures and diminished air quality impose a significant burden on state health care systems. Additionally, Plaintiffs have spent and will continue to spend significant resources addressing threats to critical infrastructure and preparing for and responding to ever-more-frequent natural disasters.

33.     In California, for example, drought conditions beginning in 2012 left reservoirs across the state at record low levels, often no more than a quarter of their capacity. The Sierra snowpack—critical to California's water supply, tourism industry, and hydroelectric power—was the smallest in at least 500 years. The resulting water cutbacks threatened the livelihoods of farmers and fishermen alike. In the Central Valley, the drought cost California agriculture about $2.7 billion and more than 20,000 jobs in 2015 alone. In addition, the drought led to land subsidence, due to reduced precipitation and increased groundwater pumping, and has contributed to the death of 129 million trees throughout the state. California has also documented a notable increase in average daily temperatures, rising sea level, coastal erosion, and an increase in the intensity and frequency of wildfires, including the worst fire season on record in 2017.

34.     As a state in the arid southwest, New Mexico is also experiencing the adverse effects of climate change and will suffer additional impacts in the future. Average temperatures in New Mexico have been increasing 50 percent faster than the global average over the past century,

1   streamflow totals in the Rio Grande and other rivers in the Southwest are declining, and

2   projections of further reduction of late-winter and spring snowpack pose increased risks to water

3   supplies needed to maintain cities, agriculture, and ecosystems. Further, drought and increased

4   temperatures due to climate change have contributed to extensive tree death across the Southwest.

5       35.     Pennsylvania faces two fundamental threats related to climate change: (1) sea level

6   rise and its impact on communities and cities in the Delaware River Basin, including the city of

7   Philadelphia; and (2) more frequent extreme weather events, including large storms, periods of

8   drought, heat waves, heavier snowfalls, and an increase in overall precipitation variability. Based

9   on studies commissioned by the Pennsylvania Department of Environmental Protection, as part of

10  its mandate under the Pennsylvania Climate Change Act, 71 P.S. §§ 1361.1 – 1361.8,

11  Pennsylvania has undergone a long-term warming of more than 1°C over the past 110 years. The

12  models used in these studies suggest this warming is a result of anthropogenic influence, and that

13  this trend is accelerating. These models show that by the middle of the 21st century, Pennsylvania

14  will be about 3°C warmer than it was at the end of the 20th century.

15      36.     In addition to greenhouse gases, landfills emit nearly thirty different organic

16  hazardous air pollutants. Of primary concern are vinyl chloride, ethyl benzene, toluene, and

17  benzene. Each of these are known to cause adverse health effects above a certain level of

18  exposure, including heart attacks, asthma, and acute bronchitis leading to premature mortality.

19  And Benzene is a known human carcinogen. This imposes a significant economic burden on

20  states, including increased health care costs and diminished economic activity.

21      37.     Volatile organic compound emissions are precursors to both fine particulate matter

22  ($PM_{2.5}$) and ground-level ozone formation. These pollutants, like methane, are associated with

23  substantial health, welfare, and climate effects.

24  **II. THE LANDFILL EMISSION GUIDELINES**

25      **A.    Promulgation of the Emission Guidelines**

26      38.     EPA first proposed rules regulating landfill emissions in 1991. In 1996, EPA listed

27  landfills as a source category that contributes significantly to air pollution that may reasonably be

28  anticipated to endanger public health and welfare, and concurrently promulgated NSPS and

emission guidelines.[3] The eight-year review of the 1996 rules was ten years overdue by the time EPA first noticed the rulemaking at issue here, on July 17, 2014. The final New Source Performance Standards and Emission Guidelines were published two years later, on August 29, 2016.

39.     The Emission Guidelines retain the same basic regulatory structure as the prior regulations: They require all municipal solid waste landfills to submit a design capacity report. Landfills with a design capacity of at least 2.5 million megagrams[4] (Mg) of waste by mass (or 2.5 million cubic meters of waste by volume) must monitor their emissions of non-methane organic compounds (NMOC), as a proxy for monitoring methane emissions directly.[5] 81 Fed. Reg. 59276, 59278. Landfills whose NMOC emissions exceed a certain threshold must install a gas collection and control system (which reduces emissions of all pollutants of concern) within thirty months. *Id*. The Emission Guidelines changed the timeframes used to classify landfills as "new" versus "existing,"[6] lowered the threshold at which a landfill must install emission controls (from 50 Mg/year to 34 Mg/year), and added a new method by which landfills can measure emissions for purposes of determining whether they must install controls. *Id*. EPA estimates that 1,851 landfills are (and would remain) subject to the Emission Guidelines and that 93 landfills that are currently "reporting but not controlling" would be required to install controls under the revised threshold. *See* 81 Fed. Reg. 59304-05, Table 2.

40.     Together, EPA estimated that the Landfill Emission Rules will reduce methane emissions by approximately 330,000 metric tons – with a global-warming potential equivalent to 8.2 million metric tons of carbon dioxide ($CO_2$e) – per year by 2025. That is roughly equivalent to the annual emissions of 1.8 million cars on the road. The Landfill Emission Rules' expected

---

[3] *Standards of Performance for New Stationary Sources and Guidelines for Control of Existing Sources: Municipal Solid Waste Landfills*, 61 Fed. Reg. 9905 (March 12, 1996).
[4] A megagram is equal to a metric ton (1.1 U.S. short tons, or 2,205 pounds).
[5] When EPA initially issued regulations limiting landfill gas emissions, NMOCs were the pollutants of primary concern. Because NMOCs are a component of landfill emissions that occur in a constant concentration relative to other components, they continue to serve as an indicator of the level of emissions of landfill gas generally, and methane in particular.
[6] The Emission Guidelines apply to any landfill that accepted waste after 1987 and/or that commenced construction, reconstruction, or modification on or before July 17, 2014. (If a landfill commenced construction, reconstruction or modification after that date, it would be subject to the New Source Performance Standards.)

benefits far outweigh their costs: EPA estimated that, by 2025, the annual *net* benefits of the regulations would be $452 million ($62 million for the New Source Performance Standards and $390 million for the Emission Guidelines.) This number accounts for avoided health-care costs attributable to reduced emissions of volatile organic compounds, and for revenue derived from sales of electricity that can be generated by the recovered landfill gas. It also reflects "global monetized climate benefits," which EPA calculated using the mean social costs[7] of methane and carbon dioxide. 81 Fed. Reg. 59276, 59280.

41.    The Landfill Emission Rules went into effect on October 28, 2016.

42.    One day prior, on October 27, 2016, a group of industry petitioners ("Industry") petitioned EPA for reconsideration of the Landfill Emission Rules. Industry concurrently filed for judicial review of the Rules[8] and, on that basis, requested that EPA issue an administrative stay. EPA took no action on the petition at that time.

**B.    EPA's 90-Day Stay of the Landfill Emission Rules**

43.    On May 5, 2017, more than eight months after the Landfill Emission Rules took effect, new EPA Administrator Pruitt sent a letter to industry groups, stating EPA's intent to grant their petition for reconsideration on the basis that "the petition has raised several objections . . . that arose after the comment period or were impracticable to raise during the comment period and that are of central relevance to the outcome of the rule[s]." Letter from Scott Pruitt, EPA Administrator (May 5, 2017). EPA also stated its intent to issue a 90-day stay of both rules "intheir entirety … ." *Id.* EPA published notice of these actions in the Federal Register on May 31, 2017 (one day after the May 30 deadline for states to submit compliance plans) and the 90-stay took effect that day. 82 Fed. Reg. 24878.

---

[7] "Social costs" are monetary values of annual impacts attributable to these emissions. The metric includes "a wide range of anticipated climate impacts, such as net changes in agricultural productivity, property damage from increased flood risk, and changes in energy system costs [e.g., heating and air-conditioning] … ." 81 Fed. Reg. at 59335.
[8] *Nat'l Waste & Recycling Ass'n, et al. v. EPA*, No. 16-1374 (D.C. Cir., Oct. 28, 2016). This lawsuit was consolidated with a separate petition for review of the Landfill Emission Rules, *Util. Air Regulatory Grp. v. EPA*, No. 16-1374 (D.C. Cir., Oct. 28, 2016). The cases are in abeyance pending EPA's reconsideration of the rules.

13

44.   On June 15, 2017, various non-governmental organizations (NGOs), including the Natural Resources Defense Council (NRDC) and the Clean Air Council (Petitioners), filed a petition for review of the administrative stay on the basis that the criteria for mandatory reconsideration were not met and the stay was thus unlawful. *Nat. Res. Def. Council, et al. v. EPA*, 2018 WL1052622.

45.   EPA's January 22, 2018 response to Petitioners' brief argued that the case was moot for the following reason: "the Stay Decision only affects deadlines in the [Landfill Emission Rules] that would have otherwise applied during the 90 days in which the stay was in effect," that is, from May 31, 2017, until August 29, 2017. Respondent's Initial Brief, p. 2.

46.   Importantly, for purposes of this action, EPA also stated that the stay did not push back any of the Emission Guidelines' compliance deadlines. Specifically, EPA stated, "the Stay Decision by its express terms began on *May 31*, not May 30, and therefore did not alter the May 30" deadline for states to submit implementation plans for existing landfills "and EPA did not purport to retroactively extend that date." *Id*. at 35 (emphasis in original). Additionally, "the Stay Decision did not affect any subsequent deadlines for existing landfills." *Id*. at 36.

47.   EPA further stated, with regard to its own obligations to implement the Emission Guidelines, that "EPA had four months, until September 31, 2017, to approve or disapprove any state plans that were timely submitted by May 30, and six months, until November 30, 2017, to promulgate a federal plan for states that did not timely submit state plans." *Id*. These deadlines "have come and gone, and the Stay Decision had no effect on them." *Id*.  Finally, EPA stated that it "has neither approved nor disapproved the state plans that were timely submitted," "nor promulgated any federal [implementation] plans" (and noted, citing 42 U.S.C. § 7604(a)(2), that "any remedy for EPA's failure to act in this regard would lie in district court"). *Id*. at 37.

48.   On January 31, 2018, on the basis of those representations, Petitioners and EPA stipulated to voluntary dismissal of the case, which explicitly reiterated the facts stated above.

### C. EPA's Failure to Respond to State Submissions or to Impose a Federal Plan

49. On May 30, 2017 – the state plan submission deadline set forth in the Emission Guidelines and one day before the stay took effect – Plaintiff CARB submitted California's state plan to EPA. Similarly, New Mexico submitted a state compliance plan for each of two regulatory jurisdictions, one on May 24, 2017 (for Albuquerque/Bernalillo County), and the other on May 25, 2017 (for the remainder of the State). Neither California nor New Mexico received a response from EPA.

50. A number of other states developed or were developing state plans. For example, on April 7, 2017, Florida requested initial comments from EPA on its proposed state plan (in connection with a solicitation for public comments). Delaware also appears to have finalized a proposal, and Maryland was in the process of developing one.

51. On October 19, 2017, CARB sent a letter to the Acting Regional Administrator for Region 9 requesting approval of its state plan by October 31, 2017. EPA failed to respond. On December 4, 2017, CARB sent a follow-up letter to the Acting Regional Administrator for Region 9, noting that it had never received a response to its state plan, and requesting either prompt approval of its plan or a timeline when it could expect to receive a decision from EPA and confirmation that a federal plan would not by imposed on California. Acting Regional Administrator for Region 9 sent an email indicating "Thank you, we'll reply shortly[.]"

52. On February 26, 2018, EPA sent a written response to CARB, stating, "Since the Agency is reconsidering various issues regarding the landfill regulations, at this time we do not plan to prioritize the review of submitted state plans nor are we working to issue a Federal [implementation] Plan for states that failed to submit a state plan. . . . Additionally, we are currently working to align our reconsideration of certain portions of the EG [Emission Guidelines] with the risk and technology review (RTR) for this source category. The EPA has a court order to complete the RTR by March 13, 2020 and the reconsideration will be finished on the same timeline."

53.   EPA has not approved any state plans or imposed a federal plan on any state that did not submit a state plan.

54.   A number of states expended significant resources – including significant personnel time and money – in submitting and/or preparing state plans to comply with the Emission Guidelines. Other states made the well-considered decision not to develop a state plan, and to instead await EPA's federal plan to achieve necessary reductions in landfill emissions.

55.   Plaintiffs are directly harmed by EPA's failure to perform its role in implementing the Emission Guidelines and to otherwise perform its role in the cooperative federalism approach embraced by Congress in the Clean Air Act.

**D.   EPA's Ongoing Failure to Implement the Emission Guidelines**

56.   EPA has unequivocally stated that it does not intend to perform its obligations to implement the Emission Guidelines. Specifically, it has stated that it does not intend to respond to state plans that have already been submitted to comply with the Emission Guidelines, nor does it intend to impose a federal plan where the regulations require that it do so. However, EPA has taken no step to lawfully suspend, revise, or rescind the Emission Guidelines.

57.   Sometime in June or July 2017 (the fact was not made public until July 20), EPA submitted to the Office of Management and Budget (OMB) a proposed rulemaking regarding the Emission Guidelines, and an identical proposal for the New Source Performance Standards, stating, "EPA intends to further extend the [90-day] stay in this action. Sources will not need to comply with these requirements while the stay is in effect."[9] In the Fall 2017 Unified Agenda, EPA more specifically proposed to extend the deadline for submission of state plans under the Emission Guidelines to March 13, 2020,[10] but it never finalized that action. In the Spring 2018 Unified Agenda, EPA noted for both Landfill Emission Rules that it was "no longer pursuing to

---

[9] https://reginfo.gov/public/do/eAgendaViewRule?pubId=201704&RIN=2060-AT64 (last visited May 11, 2018).
[10] https://reginfo.gov/public/do/eAgendaViewRule?pubId=201710&RIN=2060-AT64 (last visited May 11, 2018).

1  stay the rule[s]. No further action is planned."[11] To date, that is EPA's last word on the subject,

2  for both rules.

3     58.    On October 31, 2017, Waste Dive, an online news outlet for the waste industry,

4  reported that, in a written statement, an EPA spokesperson had said that "any states that fail to

5  submit plans for Emission Guidelines under Clean Air Act section 111(d) 'are not subject to

6  sanctions,' and should not be concerned regarding any sanctions."[12] According to Waste Dive,

7  EPA further stated, "we do not plan to prioritize the review of these state plans . . . nor are we

8  working to issue a Federal Plan for states that fail to submit a state plan."

9     59.    For a time, EPA listed the Landfill Emission Rules as one of many "EPA

10 Deregulatory Actions under Development." EPA's website now includes the stay of the Landfill

11 Emission Rules on a list of "Completed Deregulatory Actions."[13]

12    60.    EPA admits that the Landfill Emission Rules remain in effect: "Because th[e] 90-stay

13 expired on August 29, 2017, the 2016 rules are currently in effect. The EPA still intends to

14 complete the reconsideration process granted by the Administrator. EPA will continue to work

15 with states and stakeholders as we develop a path forward on these separate but related

16 actions."[14]

17                         **CAUSE OF ACTION**

18                    ***(Clean Air Act, 42 U.S.C. § 7604)***

19    61.    The allegations set forth in the foregoing paragraphs are incorporated herein by

20 reference.

21    62.    The Emission Guidelines became final on August 29, 2016, and went into effect on

22 October 28, 2016.

23

24

---

25 [11] https://reginfo.gov/public/do/eAgendaViewRule?pubId=201804&RIN=2060-AT64 (last visited May 11, 2018).

26 [12] Cody Boteler, *EPA offers public clarification on timeline for NSPS, EG landfill rules months after stay expires* (Oct. 31, 2017) *https://www.wastedive.com/news/epa-offers-public-clarification-on-timeline-for-nsps-eg-landfill-rules-mon/508484/* (last visited May 21, 2018).

27 [13] *See* https://www.epa.gov/laws-regulations/epa-deregulatory-actions (last visited May 30, 2018).

28 [14] *See* https://www.epa.gov/stationary-sources-air-pollution/municipal-solid-waste-landfills-new-source-performance-standards (last visited May 14, 2018).

63.    EPA had a non-discretionary duty pursuant to 40 C.F.R. section 60.27(b) to respond to state plan submissions within four months of the submission deadline, that is, by September 30, 2017. At least two states submitted state plans; EPA did not respond by the statutory deadline and, to date, has not responded to any state plan.

64.    EPA had a non-discretionary duty pursuant to 40 C.F.R. section 60.27(d) to promulgate a federal plan for states that did not timely submit state plans within six months of the submission deadline, that is, by November 30, 2017. Some states did not submit state plans and EPA failed to promulgate a federal plan by the statutory deadline, and to date, has not promulgated a federal plan.

65.    The Administrator has failed to perform an act or duty which is not discretionary, in violation of the Clean Air Act.

//

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

      1.    Issue a declaratory judgment that, by failing to implement and enforce the Emission Guidelines, EPA has violated the Clean Air Act;

      2.    Issue a mandatory injunction compelling EPA to implement and enforce the Emission Guidelines;

      3.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

      4.    Award such other relief as the Court deems just and proper.

Dated:  May 31, 2018

Respectfully Submitted,

For the STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General of California
GARY E. TAVETIAN
DAVID A. ZONANA
Supervising Deputy Attorneys General
JULIA K. FORGIE
Deputy Attorney General

  /s/ Elizabeth B. Rumsey
ELIZABETH B. RUMSEY
Deputy Attorney General
*For the State of California, by and through Attorney General Xavier Becerra and the California Air Resources Board*

For the STATE OF ILLINOIS

LISA MADIGAN
Attorney General of Illinois
DANIEL I. ROTTENBERG
(*pro hac vice* admission pending)
Assistant Attorney General
Environmental Bureau
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, Illinois 60602
(312) 814-3816
DRottenberg@atg.state.il.us

For the STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland
LEAH J. TULIN
(*pro hac vice* admission pending)
Assistant Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-6962
ltulin@oag.state.md.us

For the STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General of New Mexico
BILL GRANTHAM
(*pro hac vice* admission pending)
Assistant Attorney General
201 Third Street NW, Suite 300
Albuquerque, New Mexico 87102
(505) 717-3520
wgrantham@nmag.gov

For the STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General of Oregon
PAUL GARRAHAN
(*pro hac vice* admission pending)
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street, N.E.
Salem, Oregon 97301-4096
(503) 947-4342
paul.garrahan@doj.state.or.us

For the COMMONWEALTH OF
PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania
MICHAEL J. FISCHER
(*pro hac vice* admission pending)
Chief Deputy Attorney General
ROBERT A. REILEY
(*pro hac vice* admission pending)
Assistant Director, Pennsylvania Department
of Environmental Protection
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov

For the STATE OF RHODE ISLAND

PETER F. KILMARTIN
Attorney General of Rhode Island
GREGORY S. SCHULTZ
(*pro hac vice* admission pending)
Special Assistant Attorney General
RI Department of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

20

For the STATE OF VERMONT

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
NICHOLAS F. PERSAMPIERI
(*pro hac vice* admission pending)
Assistant Attorney General
Office of the Vermont Attorney General
109 State Street
Montpelier, Vermont 05609
(802) 828-3186
nick.persampieri@vermont.gov

OK2018950007
90960483.docx