1   XAVIER BECERRA
    Attorney General of California
2   GARY E. TAVETIAN
    DAVID A. ZONANA
3   Supervising Deputy Attorneys General
    TIMOTHY E. SULLIVAN, SBN 197054
4   ELIZABETH B. RUMSEY, SBN 257908
5   JULIA K. FORGIE, SBN 304701
    Deputy Attorneys General
6     1515 Clay Street, 20th Floor
      P.O. Box 70550
7     Oakland, CA 94612-0550
      Telephone: (510) 879-0860
8     liz.rumsey@doj.ca.gov
9
    Attorneys for the State of California,
10  by and through Attorney General Xavier Becerra
    and the California Air Resources Board
11
    Additional counsel listed on signature page
12

    SUSANNAH L. WEAVER
    Donahue, Goldberg & Weaver, LLP
      1008 Pennsylvania Avenue SE
      Washington, DC 20003
      Telephone: (202) 569-3818
      susannah@donahuegoldberg.com

    PETER ZALZAL
    TOMÁS CARBONELL
    ALEX GEORGE HANAFI
    RACHEL FULLMER
      Environmental Defense Fund
      2060 Broadway, Suite 300
      Boulder, CO 80302
      Telephone: (303) 447-7214
      pzalzal@edf.org
      rfullmer@edf.org

    Attorneys for Environmental Defense Fund

13          IN THE UNITED STATES DISTRICT COURT

14       FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                  OAKLAND DIVISION

16

17  **STATE OF CALIFORNIA,** *et al.*,          Case No. 4:18-cv-03237-HSG

18              **Plaintiffs,**                  **PLAINTIFFS' JOINT MOTION FOR
                                                 SUMMARY JUDGMENT**
19
                    v.
20
21  **UNITED STATES ENVIRONMENTAL               Hearing Date: April 25, 2019
    PROTECTION AGENCY,** *et al.*,               Time:        2:00 p.m.
22                                               Courtroom:   2, 4th Floor
                **Defendants**                   Judge:       Hon. Haywood S. Gilliam, Jr.
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION .................................................................................................. 1

MOTION....................................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 2

I.      INTRODUCTION ....................................................................................... 2

II.     STATEMENT OF ISSUES ......................................................................... 3

III.    PROCEDURAL BACKGROUND............................................................... 3

IV.     STATUTORY BACKGROUND.................................................................. 4

V.      STATEMENT OF FACTS .......................................................................... 5

      A.      The Deadlines Imposed by EPA's Section 111 Regulations Have Long Passed ........................................................................................ 5

      B.      Landfill Emissions Threaten Human Health and Welfare ........................ 6

      C.      The Landfill Emission Guidelines Would Achieve Meaningful Reductions in Emissions of Greenhouse Gases, VOCs, and Other Hazardous Pollutants.................................................................... 10

VI.     STANDING ............................................................................................... 11

      A.      Plaintiff States Have Standing ................................................... 11

      B.      Intervenor EDF Has Standing ................................................... 13

VII.    STANDARD OF REVIEW ....................................................................... 15

VIII.   ARGUMENT ............................................................................................ 16

      A.      EPA Has Failed to Perform Nondiscretionary Duties............................. 16

      B.      EPA Should Be Compelled to Perform Its Nondiscretionary Duties Immediately ......................................................................... 17

            1.      This Court Should Impose Strict Deadlines on EPA to Implement the Emission Guidelines ............................................ 17

            2.      EPA Should Be Ordered to Review Existing State Plans Within Thirty Days ......................................................... 19

            3.      EPA Should Be Ordered to Promulgate a Federal Plan Within Five Months ................................................... 20

            4.      EPA Should Be Ordered to Respond to Any Future State Plans Within Sixty Days of Submission ..................................... 21

            5.      EPA Should Be Ordered to File Status Reports Every Sixty Days ........................................................................ 22

IX.     CONCLUSION.......................................................................................... 22

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ............................................................................................................16

6

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ............................................................................................................16

7

8

*Clapper v. Amnesty Int'l USA*
   568 U.S. 398 (2013) ............................................................................................................15

9

10

*Coal. for Clean Air v. VWR Int'l, LLC*
   922 F. Supp. 2d 1089 (E.D. Cal. 2013) ..............................................................................13

11

*Conn. v. Am. Elec. Power Co., Inc.*
   582 F.3d 309 (2d Cir. 2009) ...............................................................................................12

12

13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*
   528 U.S. 167 (2000) ............................................................................................................11

14

15

*Hill v. Volkswagen*
   894 F.3d 1030 (9th Cir. 2018) ............................................................................................14

16

*Hunt v. Wash. State Apple Advertising Comm'n*
   432 U.S. 333 (1977) ............................................................................................................16

17

18

*Keenan v. Allan*
   91 F.3d 1275 (9th Cir. 1996) ..............................................................................................16

19

20

*Mass. v. EPA*,
   549 U.S. 497 (2007) ...........................................................................................11, 12, 13, 14

21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) ............................................................................................................16

22

23

*Nat'l Res. Def. Council v. EPA*
   896 F.3d 459 (D.C. Cir. 2018) ..............................................................................................4

24

25

*Nw. Envt'l Def. Ctr. v. Owens Corning Corp.*
   434 F. Supp. 2d 957 (D. Ore. 2006) ...................................................................................13

26

*Sierra Club v. Leavitt*
   355 F. Supp. 2d 544 (D.D.C. 2005) ....................................................................................17

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Sw. Ctr. for Biological Diversity v. Berg*
    268 F.3d 810 (9th Cir. 2001)..................................................................14

4

*Town of Chester v. Laroe Estates, Inc.*
    137 S. Ct. 1645 (2017) .........................................................................14

5

6

**FEDERAL STATUTES**

7

Clean Air Act § 101(b); 42 U.S.C. § 7401(b) ...................................................4

8

Clean Air Act § 111; 42 U.S.C. § 7411 ................................................4, 5, 18

9

Clean Air Act § 111(b)(1)(A); 42 U.S.C. § 7411(b)(1)(A)..................................4

10

Clean Air Act § 111(d); 42 U.S.C. § 7411(d) ..........................................2, 4, 5

11

Clean Air Act § 304(a); 42 U.S.C. § 7604(a) ...................................1, 2, 3, 17

12

**STATE STATUTES**

13

Cal. Health & Safety Code § 39730.5 (West 2018).......................................10

14

**COURT RULES**

15

Fed. R. Civ. P. 56 ....................................................................................1, 3

16

Fed. R. Civ. P. 56(a)....................................................................................16

17

Fed. R. Civ. P. 56(c)....................................................................................16

18

Local Rule 56-1.............................................................................................1

19

**OTHER AUTHORITIES**

20

40 C.F.R. § 60.27(b) ..........................................................................*passim*

21

40 C.F.R. § 60.27(d) ..........................................................................*passim*

22

40 C.F.R. § 60.30f(a) .....................................................................................6

23

40 C.F.R. § 60.30f(b) .....................................................................................6

24

40 Fed. Reg. 53,340 (Nov. 17, 1975)........................................................4, 18

25

61 Fed. Reg. 9,905 (Mar. 12, 1996)..............................................................15

26

64 Fed. Reg. 60,689 (Nov. 8, 1999)...............................................................21

27

28

iii

**TABLE OF AUTHORITIES**
(continued)

Page

74 Fed. Reg. 66,496 (Dec. 15, 2009) ..............................................................7

77 Fed. Reg. 22,392 (Apr. 13, 2012) ............................................................13

80 Fed. Reg. 65,292 (Oct. 26, 2015)..............................................................10

81 Fed. Reg. 35,824 (June 3, 2016) ...............................................................10

81 Fed. Reg. 59,276 (Aug. 29, 2016) (Emission Guidelines)................................. *passim*

OFFICIAL REPORTS

California Office of Environmental Health Hazard Assessment (OEHHA),
    *Indicators of Climate Change in California* (May 2018)  ........................................8

Intergovernmental Panel on Climate Change (IPCC), *Special Report on Global
    Warming of 1.5° C* at 95.................................................................................10

United States Global Climate Research Program (USGCRP), *Fourth National
    Climate Assessment, Volume II: Impacts, Risks, and Adaptation in the United
    States* (Nov. 23, 2018)............................................................... *passim*

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Please take notice that on April 25, 2019 at 2:00 p.m., before the Honorable Haywood S. Gilliam, Jr., in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, California 94612, the undersigned States and agencies (together, States) and the Environmental Defense Fund (together with States, Plaintiffs) will and hereby do move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56. This motion is based on the points and authorities set forth below, the attached declarations and exhibits, and any argument that may be presented at the hearing on the motion.

**MOTION**

EPA has failed to perform nondiscretionary duties under the Clean Air Act to implement regulations (*Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills*, 81 Fed. Reg. 59,276 (Aug. 29, 2016) (Emission Guidelines or Guidelines)) that would reduce emissions from municipal solid waste landfills of pollutants known to endanger human health and welfare. Plaintiffs bring this action under 42 U.S.C. § 7604(a), seeking an order to compel EPA to perform its nondiscretionary duties. There is no genuine dispute of any material fact in this case, and summary judgment may be entered in Plaintiffs' favor. Accordingly, Plaintiffs request that the Court grant this motion for summary judgment and issue: (1) a declaratory judgment that, by failing to perform its nondiscretionary duties to implement the Emission Guidelines, EPA has violated the Clean Air Act; and (2) a mandatory injunction compelling EPA to implement the Emission Guidelines. As to the latter, Plaintiffs request the Court order EPA to: (i) respond to already submitted state plans within thirty (30) days of the Court's order, (ii) promulgate a federal plan within five months of the Court's order, (iii) respond to future state plan submissions within sixty (60) days of submission, and (iv) file status reports with this Court every sixty (60) days (beginning sixty (60) days after the date of the Court's order and concluding when all states have either an approved state plan or federal plan) detailing EPA's progress in complying with this Court's order.

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         In this action, the undersigned Plaintiffs seek a declaratory judgment and an order

4    compelling EPA to comply with its nondiscretionary duties to implement strengthened

5    regulations for existing municipal solid waste landfills, issued under Section 111(d) of the Clean

6    Air Act, 42 U.S.C. § 7411(d). EPA failed to review and respond to states' proposed compliance

7    plans by September 30, 2017, and to promulgate a federal plan by November 30, 2017, for states

8    that did not have an approvable plan. *See* 40 C.F.R. § 60.27(b) & (d). Those duties are now long

9    overdue; EPA has stipulated that it has failed to perform them, and it cannot otherwise defend

10   against the allegations. Accordingly, there are no disputed issues of material fact, and Plaintiffs

11   are entitled to summary judgment and appropriate relief.

12        EPA's ongoing failure to enforce the Emission Guidelines has resulted and continues to

13   result in the forfeiture of critical reductions of greenhouse gas pollution, which is emitted in large

14   quantities by municipal solid waste landfills. It is well established that greenhouse gas emissions

15   cause or contribute to climate change, and, moreover, that climate change is causing significant

16   harms. And there is growing evidence—including an executive branch study published late last

17   year—that *time is of the essence* in reducing greenhouse gas emissions to avoid the most severe

18   consequences of climate change. EPA's violations are also resulting in the excess emission of

19   other pollutants that endanger human health and welfare, including ozone-forming volatile

20   organic compounds (VOCs) and cancer-causing hazardous air pollutants. These harms are

21   detailed below.

22        To promptly remedy the ongoing harms to Plaintiffs and the public resulting from EPA's

23   failure to carry out its nondiscretionary duties, and in light of EPA's demonstrated refusal to

24   perform those duties (as well as the impossibility of complying with deadlines that have long

25   passed), it is appropriate for this Court to establish clear and expeditious deadlines for EPA. *See*

26   42 U.S.C. § 7604(a). In granting such relief, it is neither necessary nor appropriate to reset the

27   clock; doing so would exacerbate the harm to Plaintiffs from dangerous emissions of greenhouse

28   gases and other harmful pollutants and would reward EPA for its unlawful conduct. As explained

2

in detail herein, the deadlines requested in this motion are reasonable in light of congressional

intent, EPA's egregious violations, the urgent need to reduce greenhouse gas emissions swiftly,

the ongoing harms to Americans living in proximity to subject landfills, and the relative

simplicity of reviewing state plans and promulgating a federal plan under the Emission

Guidelines.

## II.      STATEMENT OF ISSUES

1.      Have Plaintiffs met their burden under Rule 56 of the Federal Rules of Civil

Procedure to demonstrate that there is no genuine dispute of material fact that EPA has failed to

perform duties that are not discretionary under the Clean Air Act?

2.      Is Plaintiffs' requested remedy—namely that EPA be ordered to review the four

previously submitted state plans within (30) days of the Court's order; promulgate a federal plan

within five months of the Court's order; review any newly submitted state plans within sixty (60)

days of their submission; and provide status reports to this Court every sixty (60) days—

appropriate in light of EPA's statutory and regulatory mandates, the nature of the problem the

Emission Guidelines seek to address, the public interest, and additional circumstances?

## III.    PROCEDURAL BACKGROUND

On March 23, 2018, the States sent EPA a letter providing notice that they intended to bring

an action to compel the Administrator to perform a nondiscretionary act or duty under Clean Air

Act Section 304(a).[1] The States filed this action on May 31, 2018 (Dkt. 1). EPA filed a motion to

dismiss on August 7, 2018 (Dkt. 28). EDF filed a motion to intervene on September 13, 2018

(Dkt. 36).[2] On September 25, 2018, the States and EPA filed a joint stipulation regarding

undisputed facts (Dkt. 58), which EDF has joined (Dkt. 81).

---

[1] Notice of Intent to Sue Letter from States to Former EPA Administrator Scott Pruitt (Mar. 23, 2018), https://www.epa.gov/sites/production/files/2018-03/documents/states_noi_03232018.pdf (last accessed Jan. 19, 2019).
[2] Intervenor EDF also gave the requisite 60 days of notice prior to filing its motion to intervene. Notice of Intent to Sue Letter from David Doniger and Lissa Lynch, Natural Resources Defense Council, and Tomás Carbonell, Peter Zalzal, and Alice Henderson, Environmental Defense Fund to Former EPA Administrator Scott Pruitt (June 19, 2018), https://www.epa.gov/sites/production/files/2018-06/documents/nrdc_noi_06192018.pdf (last accessed Jan. 18, 2019).

1    The Court heard the motions on October 25, 2018. At the hearing, EPA announced its

2    intention to seek a stay of the matter pending conclusion of a rulemaking EPA had announced just

3    two days prior, on October 23, 2018. *See* EPA Notice of Proposed Rule (Dkt. 68). EPA filed its

4    motion to stay on November 5, 2018 (Dkt. 70). The Court denied EPA's motion to stay and its

5    motion to dismiss on December 21, 2018 (Dkt. 82), confirming that the Court has jurisdiction to

6    adjudicate Plaintiffs' claims, and set a summary judgment briefing schedule. In the meantime, the

7    Court granted EDF's motion to intervene on November 20, 2018, and noted that EDF would

8    proceed under the existing complaint filed by the States (Dkt. 78). As of the filing of this motion,

9    EPA has not yet answered the States' complaint.

10   **IV.   STATUTORY BACKGROUND**

11   The rules at issue here arise under Section 111 of the Clean Air Act (or the Act). The

12   fundamental goal of the Act is "to protect and enhance the quality of the Nation's air resources so

13   as to promote the public health and welfare and the productive capacity of its population." 42

14   U.S.C. § 7401(b). The supremacy of public health is one of the broad governing principles of the

15   Act. *Nat'l Res. Def. Council v. EPA*, 896 F.3d 459, 464 n.4 (D.C. Cir. 2018).

16   Section 111 was added as part of the 1970 amendments to the Act. As EPA explained in

17   promulgating regulations implementing Section 111(d), "[e]ven a cursory examination of the

18   legislative history of the 1970 amendments reveals that Congress was dissatisfied with air

19   pollution control efforts at all levels of government and was convinced that relatively drastic

20   measures were necessary to protect public health and welfare. The result was a series of far-

21   reaching amendments which . . . required EPA and the States to take *swift and aggressive action*"

22   to reduce pollution. 40 Fed. Reg. 53,340, 53,342–43 (Nov. 17, 1975) (emphasis added).

23   Section 111 directs the EPA Administrator to "publish . . . a list of categories of stationary

24   sources" that "in [the Administrator's] judgment . . . cause[], or contribute[] significantly to, air

25   pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C.

26   § 7411(b)(1)(A). Once the agency includes a category of stationary sources in the list, the agency

27   must "publish proposed regulations, establishing Federal standards of performance" for the

28   emission of pollutants from new or modified sources "within such category." *Id.* § 7411(b)(1)(B);

4

1   *see also id.* § 7411(a)(2). EPA is required to review and, if appropriate, revise those rules every

2   eight years. *Id*. § 7411(b)(1)(B).

3       Section 111 also requires the regulation of "existing sources" that fall within the same

4   category. *Id.* § 7411(d). Specifically, the Act states that "[t]he Administrator shall prescribe

5   regulations which shall establish a procedure similar to that provided by section 7410 of this title

6   under which each State shall submit to the Administrator a plan [that] establishes standards of

7   performance" and "provides for the implementation and enforcement of such standards of

8   performance." *Id.* § 7411(d)(1). Section 111 further provides that the Administrator has authority

9   to promulgate a federal plan "in cases where [a] State fails to submit a satisfactory plan." *Id.*

10   § 7411(d)(2).

11   **V.   STATEMENT OF FACTS**

12       The material facts establishing EPA's liability are not subject to genuine dispute. EPA has

13   acknowledged that it failed to perform the nondiscretionary duties at issue. Joint Stipulation

14   Regarding Undisputed Facts at ¶¶ 1–3 (Dkt. 58) (Sept. 25, 2018) (Joint Fact Stip.). These are the

15   only facts necessary to show that summary judgment should be granted in Plaintiffs' favor.

16       To assist the Court in determining the appropriate remedy for EPA's violations, Plaintiffs

17   also provide evidence regarding the harms to human health and welfare caused by EPA's failure

18   to implement the Emission Guidelines, and the urgent need for immediate relief. These harms

19   include impacts from climate change—one of the most pressing threats to human health and

20   welfare in our time—along with serious health and welfare impacts attributable to smog-forming

21   and cancer-causing pollution emitted from landfills.

22       **A.   The Deadlines Imposed by EPA's Section 111 Regulations Have Long
             Passed**

23

24       EPA published the final Emission Guidelines on August 29, 2016, and the Guidelines went

     into effect on October 28, 2016. The Emission Guidelines require each state with one or more

25   landfills subject to the rule to submit a state plan to EPA to implement the Guidelines by May 30,

26   2017. 40 C.F.R. § 60.30f(a) & (b). According to data provided by EPA, every state has such a

27   landfill. *See* Decl. of Elizabeth B. Rumsey (Rumsey Decl., attached hereto), ¶ 14. In turn,

28

5

1    according to EPA's regulations: (1) EPA was required to approve or disapprove submitted plans

2    by September 30, 2017, *see* 40 C.F.R. § 60.27(b); and (2) if either (a) states to which the

3    guideline pertained did not submit plans, or (b) EPA disapproved a submitted plan, then EPA was

4    required to promulgate a federal plan by November 30, 2017, *see* 40 C.F.R. § 60.27(d). EPA has

5    stipulated in the D.C. Circuit Court of Appeals that it was bound by these deadlines. *See* Ex. 1,[3]

6    Dismissal Stip. at 2, *Natural Res. Def. Council v. Pruitt*, No. 17-1157, ECF 1715796 (D.C. Cir.

7    Jan. 31, 2018) (EPA "had four months, until September 30, 2017, to approve or disapprove any

8    state plans that were timely submitted by May 30, and six months, until November 30, 2017 to

9    promulgate a federal plan for states that did not timely submit state plans.").

10           In this Court, EPA has stipulated that (1) "As of May 30, 2017, EPA had received proposed

11    plans addressing the emission guidelines promulgated for municipal solid waste landfills . . . from

12    the State of California and the State of New Mexico [and later from Arizona]," and "EPA has not

13    approved or disapproved any of these plans pursuant to 40 C.F.R. § 60.27(b)"; and (2) while

14    "EPA has not received from any other state a proposed plan addressing the emission guidelines

15    promulgated for municipal solid waste landfills," "EPA has not promulgated regulations setting

16    forth a federal plan for any state pursuant to 40 C.F.R. § 60.27(d) addressing the emission

17    guidelines promulgated for municipal solid waste landfills." Joint Fact Stip. at ¶¶ 1–3. To the

18    D.C. Circuit, EPA said more plainly: "The[se deadlines] . . . have come and gone," and "EPA has

19    neither approved nor disapproved the state plans that were timely submitted, nor has EPA

20    promulgated any federal plans." Ex. 2, Resp'ts' Br. at 36, 37, *Natural Res. Def. Council v. Pruitt*,

21    No. 17-1157, ECF 1714147 (D.C. Cir. Jan. 22, 2018).

22           **B.    Landfill Emissions Threaten Human Health and Welfare**

23           Landfills are a significant source of air pollutants, including methane (a powerful

24    greenhouse gas), smog-forming VOCs, and cancer-causing hazardous air pollutants.

25           In 2014, landfills represented the third largest source of methane emissions in the United

26    States. *See* Emission Guidelines at 59,279. It is well established that greenhouse gases (including

27    methane) cause or contribute to climate change: In December 2009, EPA determined that

28    _____

    [3] Exhibits 1-12 referenced in this memorandum are identified and described in the Rumsey Decl.

6

1  greenhouse gases endanger public health and welfare because of their contribution to climate

2  change. 74 Fed. Reg. 66,496 (Dec. 15, 2009). Among greenhouse gases, methane is of particular

3  concern: It is short-lived in the atmosphere relative to carbon dioxide, but it absorbs much more

4  energy. *See* Ex. 3, EPA, *Understanding Global Warming Potentials*.[4] Methane is also a precursor

5  to ozone formation. *Id.* As a result, methane is 84 to 87 times more potent as a greenhouse gas

6  than carbon dioxide over a 20-year timeframe. *Id*. In other words, in the near term, one ton of

7  methane contributes as much to climate change as 84 tons of carbon dioxide.

8      Evidence that the United States is already experiencing the deleterious impacts of climate

9  change is overwhelming and incontrovertible. Just two months ago, on November 23, 2018, the

10 federal government—through the United States Global Climate Research Program (USGCRP), a

11 federal program for which EPA is a constituent agency—issued Volume II of the Fourth National

12 Climate Assessment, a dire, 1,500-page report about the effects of climate change on the health

13 and welfare of Americans and the United States economy. *See* Ex. 4, USGCRP, *Fourth National*

14 *Climate Assessment, Volume II: Impacts, Risks, and Adaptation in the United States* (Nov. 23,

15 2018) (National Assessment) (excerpts).[5] The National Assessment is a comprehensive,

16 interdisciplinary assessment that represents the executive branch's best understanding of the

17 causes and consequences of climate change for the United States. In sum, "[i]t concludes that *the*

18 *evidence of human-caused climate change is overwhelming and continues to strengthen, that the*

19 *impacts of climate change are intensifying across the country, and that climate-related threats to*

20 *Americans' physical, social, and economic well-being are rising.*" *Id*. at 36.

21     The National Assessment provides detailed evidence of specific harms climate change has

22 imposed on the United States. A number of these impacts directly threaten human health and

23 well-being, particularly populations that are already vulnerable, including "[h]igher temperatures,

24 increasing air quality risks, more frequent and intense extreme weather and climate-related

25 events, increases in coastal flooding, disruption of ecosystem services, and other changes." *Id.* at

26 55. These impacts are well documented. In May 2018, the California Environmental Protection

27 [4] Also available at https://www.epa.gov/ghgemissions/understanding-global-warming-potentials#Learn%20why (last accessed Jan. 16, 2019).

28 [5] Also available at https://nca2018.globalchange.gov/ (last accessed Jan. 15, 2019).

7

Agency's Office of Environmental Health Hazard Assessment issued a multi-agency report that identified thirty-six indicators of climate change in the state. *See* Ex. 5, *Indicators of Climate Change in California* (Climate Indicators Report) (excerpts).[6] One of these indicators is heat-related morbidity and mortality. Since 1895, annual mean temperatures in California have increased by about 2.2 degrees Fahrenheit ($^o$F) (or about 1.8$^o$F per century). *See id.* at 55–56. Studies in California have documented increased mortality risk not only with extreme heat events, but also with increasing apparent temperature.[7] *See* Decl. of Dr. Rupa Basu (Basu Decl., attached hereto), ¶¶ 9, 10; *see also* National Assessment at 416 (noting a correlation between increased temperatures and an increase in hospitalization rates, with a mean cost per hospital stay of $20,050).

Sea level rise is another concern. For example, on the Oregon coast, sea level could rise up to 47 inches by the end of the 21st century under a "high greenhouse gas emissions" scenario, placing thousands of Oregonians and their homes, and over 100 miles of roads in Oregon, at risk of inundation from annual flood events reaching 4 feet above high tide. *See* Decl. of Philip Mote (Mote Decl., attached hereto), ¶ 5. Coastal erosion is already accelerating. *Id.* ¶ 10. In Maryland, it is estimated that sea level could be 2.1 feet higher in 2050 than in 2000, threatening critical infrastructure like the Port of Baltimore. *See* Decl. of George S. Aburn, Jr. (Aburn Decl., attached hereto), ¶ 8. The nation and Plaintiffs are also grappling with wildfires, the number and intensity of which are increasing in tandem with rising temperatures. Climate Indicators Report at 185. California, for one, has endured the "worst wildfire season on record" for two consecutive years. *See* Decl. of Glenn Patterson (Patterson Decl., attached hereto), ¶¶ 6, 8; *see also id.* at ¶¶ 6, 7 (noting that in 2018, the Camp Fire destroyed the town of Paradise, California, killed 86 people, and burned 153,336 acres and 18,804 structures).

Climate-related impacts have already imposed significant economic costs: The National Assessment notes that the National Oceanic and Atmospheric Administration "estimates that the

---

[6] Also available at https://oehha.ca.gov/media/downloads/climate-change/report/2018caindicatorsreportmay2018.pdf (last accessed January 16, 2019).

[7] Apparent temperature is the general term for the perceived outdoor temperature, caused by the combined effects of air temperature and relative humidity. Climate Indicators Report at 173-74.

1   United States has experienced 44 billion-dollar weather and climate disasters since 2015 (through

2   April 6, 2018), incurring costs of nearly $400 billion." National Assessment at 66 (explaining

3   further that these "extreme events have already become more frequent, intense, widespread, or of

4   longer duration" due to climate change). The costs of climate change on states are wide-ranging

5   and are likely to increase. *See, e.g.*, Patterson Decl., ¶ 10 (noting that, in California, the average

6   cost of fighting wildfires has almost tripled since 2000, to roughly $650 million per year); Aburn

7   Decl., ¶ 10 (noting that "[i]ncreased frequency of summer heat stress has the potential to

8   negatively affect both field crops and milk production yields"); Mote Decl., ¶ 5 (noting that sea

9   level rise presents a significant threat to coastal infrastructure).

10          Climate-related impacts are projected to intensify, but "how much they intensify will

11   depend on actions taken to reduce global greenhouse gas emissions." National Assessment at 36.

12   The National Assessment could not be clearer that time is of the essence: "[T]his assessment

13   shows that more immediate and substantial global greenhouse gas emissions reductions . . . would

14   be needed to avoid the most severe consequences in the long term." *Id*. at 27; *see also id.* at 26

15   ("Future risks from climate change depend primarily on decisions made today."). Indeed, the

16   evidence shows that immediate reductions in greenhouse gases would yield outsized returns:

17   "Early and substantial mitigation offers a greater chance for achieving a long-term goal, whereas

18   delayed and potentially much steeper emissions reductions jeopardize achieving any long-term

19   goal given uncertainties in the physical response of the climate system to changing atmospheric

20   $CO_2$, mitigation deployment uncertainties, and the potential for abrupt consequences." *Id.* at 1351.

21   In light of the urgent need for immediate reductions in greenhouse gases, and because of

22   methane's significant near-term global-warming potential, reducing emissions of methane and

23   other short-lived climate pollutants is a top priority. *See, e.g.*, Cal. Health & Safety Code

24   § 39730.5 (West 2018) (requiring the development and implementation of an aggressive and

25   comprehensive short-lived climate pollutant strategy); *see also* Ex. 6, International Panel on

26   Climate Change (IPCC), *Special Report on Global Warming of 1.5° C* at 95[8] ("Limiting warming

27

28   _____

[8] Also available at https://www.ipcc.ch/sr15/ (last accessed Jan. 16, 2019).

9

1  to 1.5° C implies reaching net zero $CO_2$ emissions globally around 2050 and concurrent deep

2  reductions in emissions of non-$CO_2$ forcers, particularly methane.").

3        In addition to greenhouse gases, EPA has found that landfills emit significant quantities of

4  VOCs and hazardous air pollutants that harm human health and welfare. Emission Guidelines at

5  59,281. VOCs form ozone, and short-term exposure to ozone can cause chest pain, coughing, and

6  throat irritation, while long-term exposure can cause decreased lung function and chronic

7  obstructive pulmonary disease. *Id.*; *see also* 80 Fed. Reg. 65,292, 65,322 (Oct. 26, 2015)

8  (detailing adverse health impacts of ozone exposure, particularly to children, older adults, and

9  people with lung diseases). Ozone is also linked to premature death, and even moderate decreases

10  in the level of exposure can prevent hundreds of premature deaths per year. *See* Ex. 7, EPA,

11  *Ground-Level Ozone Overview.*[9] Recent evidence suggests that ozone exposure may be

12  associated with increased mortality, strokes, heart disease, respiratory diseases such as asthma

13  and reduced lung function, and some reproductive and developmental effects. *See* Basu Decl.,

14  ¶ 12; *see also* 80 Fed. Reg. at 65,308–09. Landfills also emit hazardous air pollutants like

15  benzene and formaldehyde. Emission Guidelines at 59,281. There is no safe exposure threshold

16  for many hazardous air pollutants, exposure to which increases the risk of many cancer and

17  noncancer health impacts, including respiratory and neurological illnesses. *See* 81 Fed. Reg.

18  35,824, 35,837 (June 3, 2016). EPA has noted that the impacts of these VOCs and hazardous air

19  pollutants "can be felt many miles away" from the landfill. Emission Guidelines at 59,312.

20        **C.    The Landfill Emission Guidelines Would Achieve Meaningful Reductions
            in Emissions of Methane, VOCs, and Other Hazardous Pollutants**

21

22        EPA asserted that the Emission Guidelines "are expected to significantly reduce emissions

23  of [landfill gas] and its components." Emission Guidelines at 59,279. Specifically, EPA estimated

24  that the Guidelines would achieve reductions of 1,810 megagrams per year (Mg/year) of VOCs

25  and hazardous air pollutants and 285,000 metric tons per year of methane. *Id.* at 59,280. The

26  Guidelines are expected to further reduce greenhouse gas emissions (by about 277,000 metric

27  _____

[9] Also available at https://www.epa.gov/sites/production/files/2015-
10/documents/overview_of_2015_rule.pdf (last accessed Jan. 16, 2019).

28

tons of $CO_2$) by displacing fossil fuel-generated electricity with electricity generated by the captured methane gas. *Id.*; *see also* Ex. 8, EPA, *Emission Guidelines Fact Sheet* at 4.[10] In total, these direct and indirect emissions reductions are the equivalent of approximately 7.3 million metric tons of $CO_2$. *Id.* That is the annual equivalent of the greenhouse gases emitted by more than 1.5 million cars.[11] The expected benefits of the Emission Guidelines far outweigh the costs: EPA estimated that from 2019 (the first year the Guidelines were expected to yield emission reductions) to 2030, the *net annual* benefits of the rule would be between $380 and $480 million (2012$). Ex. 9, Emission Guidelines Regulatory Impact Analysis at 181, Tab. 6-7.[12]

## VI.   STANDING

Plaintiffs have standing to bring this suit to compel EPA to perform its nondiscretionary duties to implement the Emission Guidelines. Standing is established where a plaintiff shows that it: (1) has suffered an "injury in fact" that is (2) fairly traceable to the challenged action of the defendants, and (3) is likely redressable by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).

### A.   Plaintiff States Have Standing

The Supreme Court has specifically recognized states' standing to sue in cases involving harm to their quasi-sovereign interests. "Well before the creation of the modern administrative state," the Court stated in *Massachusetts v. EPA*, "we recognized that States are not normal litigants for the purposes of invoking federal jurisdiction." 549 U.S. 497, 518 (2007). The Court observed that a state's "well-founded desire to preserve its sovereign territory" (which territory includes "all the earth and air within its domain") supports standing in cases implicating territorial harms. *Id.* at 519. That a state's own territory is the "territory alleged to be affected" by the challenged action "reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power." *Id.*; *see also Conn. v. Am.*

---

[10] Also available at https://www.epa.gov/sites/production/files/2016-09/documents/landfills-final-nsps-eg-factsheet.pdf (last accessed Jan. 16, 2019).
[11] *See* EPA, Greenhouse Gas Equivalencies Calculator, https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator (last accessed Jan. 22, 2019).
[12] Also available at https://www3.epa.gov/ttnecas1/docs/ria/landfills_ria_final_eg-nsps_2016-07.pdf (last accessed Jan. 19, 2019).

11

1    *Elec. Power Co., Inc.*, 582 F.3d 309, 340–42 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S.

2    410 (2011). This principle—that the States are "entitled to special solicitude" in the standing

3    analysis where their quasi-sovereign interests are threatened, *Mass. v. EPA*, 549 U.S. at 520—

4    serves only to strengthen the conclusion that the States have standing to maintain this action,

5    which is compelled by the evidence set forth below.

6         With respect to the first prong of the standing analysis, there is significant evidence that

7    greenhouse gas emissions harm the States, including State-owned lands and infrastructure, and

8    the health and welfare of the States' citizens and natural resources, among other things. As

9    described *supra*, Section V.B., climate change is having significant effects on the States' shore

10   lines, forests, roads, and citizens. *See also* National Assessment at 1107–10 (describing the effects

11   of climate change on Plaintiffs California's and New Mexico's lands, resources, and

12   infrastructure). This evidence, which has only grown stronger in the decade since the Supreme

13   Court decided *Massachusetts v. EPA*, more than suffices to demonstrate injury. *See, e.g.*, National

14   Assessment at 36 ("This report draws a direct connection between the warming atmosphere and

15   the resulting changes that affect Americans' lives, communities, and livelihoods, now and in the

16   future."); *see also Mass. v. EPA*, 549 U.S. at 521 ("The harms associated with climate change are

17   serious and well recognized."); Basu Decl., ¶ 9 (noting correlation between extreme heat events

18   and mortality risk); Mote Decl., ¶ 5 (noting that sea level rise threatens homes and infrastructure

19   in Oregon); Aburn Decl., ¶ 12 (noting that excessively warm temperatures and extreme

20   precipitation have increased the risk of a number of infectious diseases).

21        Second, because landfill emissions contribute to climate change and other adverse effects,

22   EPA's failure to implement the Emission Guidelines "at a minimum . . . 'contributes' to [the

23   States'] injuries." *Mass. v. EPA*, 549 U.S. at 523. EPA estimates that the Emission Guidelines

24   will reduce hundreds of thousands of metric tons of methane emissions. Emission Guidelines at

25   59,280. As EPA itself has admonished, "[e]ach additional ton of greenhouse gases emitted

26   commits us to further change and greater risks." 77 Fed. Reg. 22,392, 22,395 (Apr. 13, 2012).

27   And there is increasing urgency to reduce greenhouse gas emissions, to avoid these "greater

28   risks." *See, e.g.*, National Assessment at 27 (calling for "immediate and substantial global

12

1  greenhouse gas emissions reductions" to avoid the most severe long-term consequences of

2  climate change).

3      Finally, the requested relief—an injunction ordering EPA to expeditiously implement the

4  Guidelines—would, at the very least, "reduce[] to some extent" the States' risk of injury by

5  resulting in a reduction in these significant emissions, thereby satisfying redressability. *Mass. v.*

6  *EPA*, 549 U.S. at 526; *see Nw. Envt'l Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp. 957,

7  968 (D. Ore. 2006) ("Plaintiffs need not show that the entire problem (for instance, global

8  warming) will be cured if the Plaintiffs prevail in this action, or that the challenged action is the

9  exclusive source of that harm.").

10      In addition to climate harms, the health of the States' citizens living in proximity to landfills

11  is also threatened by the VOCs and hazardous air pollutants emitted by landfills. *See supra*,

12  Section V.B. These harms are likewise caused by EPA's failure to implement the Emission

13  Guidelines, which aim to reduce emissions of these pollutants, and will be redressed by a court

14  order requiring EPA to implement the Guidelines. *See Coal. for Clean Air v. VWR Int'l, LLC*, 922

15  F. Supp. 2d 1089, 1100 (E.D. Cal. 2013) ("Being compelled to breathe air less pure than that

16  which otherwise would be mandated by the [Clean Air Act] is a valid injury in fact for standing

17  purposes. The alleged injury is also directly traceable to Defendant's alleged non-compliance

18  with [law]." (internal citation omitted)).

19      **B.   Intervenor EDF Has Standing**

20      Intervenor EDF likewise has standing to bring this suit.[13] "An association has standing to

21  bring suit on behalf of its members when: (a) its members would otherwise have standing to sue

22  in their own right; (b) the interests it seeks to protect are germane to the organization's purpose;

23  and (c) neither the claim asserted nor the relief requested requires the participation of individual

24  _____

25  [13] Although the States and EDF each independently have standing, only one litigant need
    demonstrate Article III standing because all of the Plaintiffs seek the same relief. *See Town of*

26  *Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("For all relief sought, there must be
    a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an

27  intervenor of right. Thus, at the least, an intervenor of right must demonstrate Article III standing
    when it seeks additional relief beyond that which the plaintiff requests."); *Hill v. Volkswagen*, 894

28  F.3d 1030, 1044 (9th Cir. 2018) (similar); *see also Mass. v. EPA*, 549 U.S. at 518 ("Only one of
    the petitioners needs to have standing to permit us to consider the petition for review.").

1  members in the lawsuit." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 821 n.3 (9th

2  Cir. 2001). EDF satisfies these three requirements.

3        EDF represents over 461,000 members in all fifty states and the District of Columbia. Decl.

4  of John Stith (Stith Decl., attached hereto), ¶ 11. Numerous EDF members live in such close

5  proximity to covered landfills that they suffer from the localized health impacts and increased

6  cancer risk associated with their exposure to hazardous air pollutants. Based on mapping done at

7  the time EDF moved to intervene in this case, at least 47 EDF members live within a quarter mile

8  of a covered landfill, 1,413 EDF members live within one mile of a covered landfill, and 21,082

9  EDF members live within 3 miles of a covered landfill. *Id.* ¶ 12. Moreover, EDF has at least

10 57,404 members living in a county that violates the 2015 health-based standard for ground-level

11 ozone and that also contains one or more of the covered landfills. *Id.* ¶ 12. These landfills are

12 currently contributing VOCs that increase already unhealthy amounts of ozone pollution in these

13 areas, resulting in serious and potentially long-lasting health effects.

14       For example, EDF member Trisha Sheehan—a mother of three young children—lives

15 seven miles from the Pennsauken Sanitary Landfill, which is subject to increased pollution

16 capture requirements after its anticipated 2019 retirement under the Emission Guidelines, but

17 would be permitted to remove pollution controls under the old guidelines. Decl. of Trisha

18 Sheehan (Sheehan Decl., attached hereto), ¶¶ 2, 3, 5; *compare* Emission Guidelines at 59,301

19 *with* 61 Fed. Reg. 9,905, 9,907 (Mar. 12, 1996). The county where Trisha and her family live is

20 also in nonattainment with the 2015 national health-based standard for ground-level ozone. *Id.*

21 ¶ 7. Trisha's children enjoy numerous outdoor activities; however, on days when ozone pollution

22 is unsafe, Trisha is forced to limit her children's time outdoors, due to the increased danger to

23 children from ozone exposure, in order to protect their health. *Id.* ¶¶ 8, 9.

24       EPA's continued inaction on the Emission Guidelines also harms EDF's members due to

25 the impacts from climate change. For example, EDF member Denise Fort lives in Santa Fe

26 County, where she is impacted by "elevated temperatures, reduced snowfall in the mountains, and

27 an increase in both the occurrence and severity of extreme weather events like droughts and heat

28 waves." Decl. of Denise Fort (Fort Decl., attached hereto), ¶ 10. Denise's "home in Santa Fe is in

14

1    a pinon-juniper forest, which is affected by a bark beetle that spreads during conditions that are

2    more prevalent in warmer climates. The bark beetle kills pinons." *Id.* ¶ 11. Further, the damage

3    from the bark beetle—dead trees—creates "ready fuel for increasingly intense and frequent

4    wildfires," which requires Denise to remove "lower branches from trees in [her] yard" and

5    remove "dead vegetation close to [her] house." *Id.* The destruction of her landscaping from the

6    dead pinons and the risk of forest fires destroying her home have "an obvious negative effect on

7    [her] life and on [her] property value." *Id.* In addition to the present harm, there is a "substantial

8    risk" that these harms will be exacerbated absent immediate action to reduce greenhouse gas

9    emissions. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

10        EDF's members' injuries are traceable to EPA's failure to implement the Emission

11   Guidelines, which would reduce emissions of the pollutants that harm them. Further, if EPA is

12   ordered to comply with its nondiscretionary duty to implement the Emission Guidelines, it will

13   reduce the air pollution and contribution to climate change, thereby redressing the harms and

14   threatened harms to EDF's members, including Trisha and Denise.

15        EDF also plainly satisfies the last two prongs of the associational standing test. EDF, which

16   "relies on science, economics, and law to protect and restore the quality of our air, water, and

17   other natural resources," has a long history of involvement with issues surrounding municipal

18   solid waste landfills generally, and with the Emission Guidelines in particular. Stith Decl. ¶¶ 4, 7-

19   9. And individual member participation is not required to advance this litigation; nor are any

20   claims presented that would require or benefit from individual participation or require

21   "individualized proof." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).

22   **VII.   STANDARD OF REVIEW**

23        Summary judgment is appropriate when the record shows that "there is no genuine dispute

24   as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

25   56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty*

26   *Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if the evidence

27   is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

28

1    Plaintiffs "bear[] the initial responsibility" of "identifying those portions" of the record that

2    "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

3    317, 323 (1986). If Plaintiffs carry that initial burden, the burden shifts to EPA to show that

4    sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect

5    to the "element[s] essential to that party's case, and on which that party will bear the burden of

6    proof at trial." *Id.* at 322. In opposing, the nonmoving party "must do more than simply show that

7    there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith*

8    *Radio Corp.*, 475 U.S. 574, 586 (1986); it must set forth competent evidence setting forth specific

9    facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *see also Celotex*,

10   477 U.S. at 324; *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (opposing party must

11   "identify with reasonable particularity the evidence that precludes summary judgment").

12   **VIII.   ARGUMENT**

13       **A.    EPA Has Failed to Perform Nondiscretionary Duties**

14       EPA concedes liability. EPA's regulations required the agency to review and approve or

15   disapprove submitted state plans by September 30, 2017, *see* 40 C.F.R. § 60.27(b), and to

16   promulgate a federal plan by November 30, 2017, for any state that did not submit an approvable

17   plan, *see* 40 C.F.R. § 60.27(d). *See* Emission Guidelines at 59,304 (calculating deadlines). EPA

18   stipulated in the D.C. Circuit Court of Appeals that it was bound by these deadlines. *See* Ex. 1,

19   *Natural Res. Def. Council v. Pruitt*, Dismissal Stip. at 2. And the agency has stipulated in this

20   Court that it failed to meet those deadlines. *See* Joint Fact Stip. at ¶¶ 1–3 (stipulating that while

21   EPA received three state plans, it "has not approved or disapproved any of these plans," and that

22   while EPA has not received any other state plans, it "has not promulgated regulations setting forth

23   a federal plan for any state"); *see also* Ex. 2, *Natural Res. Def. Council v. Pruitt*, Resp'ts' Br. at

24   36, 37 ("The[se deadlines] have come and gone," and "EPA has neither approved nor

25   disapproved the state plans that were timely submitted, nor has EPA promulgated any federal

26   plans.").

27       This Court has held that the regulations at issue create nondiscretionary duties under the

28   Clean Air Act. *See* Order Denying Defendants' Motion to Dismiss and Motion to Stay, Dkt. No.

16

82 at 7 (Dec. 21, 2018) (agreeing with the court in *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544 (D.D.C. 2005) that Congress's intent to hold EPA accountable for failing to perform duties set forth in regulations under the Clean Air Act was "readily discernable"). There is no dispute that EPA has violated its regulations, flouting deadlines intended to protect public health and welfare.

**B.      EPA Should Be Compelled to Perform Its Nondiscretionary Duties Immediately**

EPA is already more than 16 months overdue in fulfilling its nondiscretionary duty to review state plans and more than 14 months overdue in fulfilling its nondiscretionary duty to promulgate a federal plan. This Court has jurisdiction pursuant to Section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), "to compel the Administrator to perform an act or duty which is not discretionary." EPA has unequivocally failed to perform its nondiscretionary duties to implement the Emission Guidelines, and this Court should compel EPA to perform those duties as expeditiously as possible.

**1.      This Court Should Impose Strict Deadlines on EPA to Implement the Emission Guidelines**

Through Section 111, Congress sought to "require[] EPA and the states to take swift and aggressive action" to reduce emissions of pollutants known to endanger human health and welfare. 40 Fed. Reg. at 53,342–43. Several factors in this case counsel in favor of immediate relief, including EPA's almost two-year-long unlawful campaign to delay implementation of the Emission Guidelines; the urgent need to avert harms to human health and welfare and associated economic harms, including by reducing methane emissions in the near-term to avoid the worst effects of climate change; and the relative simplicity of reviewing state plans and promulgating a federal plan under the Emission Guidelines at issue.

For well over a year, EPA has openly and flagrantly violated nondiscretionary regulatory duties through a sustained effort to unlawfully undermine the Emission Guidelines—a regulation to protect human health and welfare that EPA is bound to faithfully execute (and has conceded it was required to implement). As explained in detail in Plaintiffs' Opposition to EPA's Motion to Stay, EPA undermined the Act's cooperative federalism regime by refusing to review plans duly developed and submitted by states, and by encouraging states to violate their duties to submit

17

1   plans. *See* State Pls.' Opp. to EPA's Mot. to Stay Case, Dkt. 73 at 5 (Nov. 9, 2018) (Stay Opp.).[14]

2   And it continued to do all of these things after the States gave EPA notice of their intent to bring

3   this lawsuit, and even after EPA conceded that it was violating its regulatory obligations. A court

4   order setting specific and expeditious deadlines is needed to ensure EPA follows the law.

5       The Emission Guidelines that EPA has refused to implement aim to reduce emissions of air

6   pollutants EPA has deemed dangerous to human health and welfare. Each additional day of delay

7   in approving state plans or promulgating a federal plan results in worsening air quality and

8   increased climate harms, exacerbating Plaintiffs' injuries. *See supra*, Section V.B & VI. The

9   emissions the Guidelines would reduce include hundreds of thousands of tons of methane, a

10  powerful climate-forcing pollutant. Emission Guidelines at 59,281. As the federal government

11  has concluded, climate change is an urgent problem that threatens enormous health,

12  environmental, and economic consequences for all Americans. *See supra*, Section V.B. It is also a

13  problem that must be addressed immediately; *any* delay in cutting emissions (especially

14  emissions of short-term climate forcers like methane) threatens our ability to avoid the worst

15  effects of climate change. Similarly, the harmful ozone-forming VOCs and cancer-causing

16  hazardous air pollutants will have immediate and deleterious consequences for the thousands of

17  Americans living in proximity to these significant pollution sources.

18      Finally, the remedy Plaintiffs propose is reasonable, especially in light of the time that has

19  elapsed and EPA's continuing egregious violations. In addition, implementing the Emission

20  Guidelines is straightforward: this is not the first time states have submitted plans to implement

21  emission guidelines for municipal solid waste landfills or that EPA has issued a federal plan.

22

23  ---

[14] *See, e.g.*, Cody Boteler, *EPA Offers Public Clarification on Timeline for NSPS, EG Landfill Rules Months After Stay Expires*, WASTE DIVE (Oct. 31, 2017)

24  https://www.wastedive.com/news/epa-offers-public-clarification-on-timeline-for-nsps-eg-landfill-rules-mon/508484/ (EPA spokesperson press statement that "[s]ince the Agency is

25  reconsidering various issues regarding the landfill regulations, at this time we do not plan to prioritize the review of these state plans"; states that did not submit plans "are not subject to

26  sanctions"); *see also* Decl. of Susannah L. Weaver (Weaver Decl., attached hereto), Ex. A, Email from Kenneth Boyce, Environmental Protection Specialist, EPA to State Regulators in Louisiana,

27  Oklahoma, New Mexico, Texas, and Arkansas Re: EPA Stays Landfill Methane Rules Press Release (May 24, 2017) (informing state regulators of the stay and relaying that "states don't

28  have to do anything now").

Neither states nor EPA will be working from a blank slate. Rather, they need only *revise* the existing plans to incorporate the updated standards.

### 2.  EPA Should Be Ordered to Review Existing State Plans Within Thirty Days

EPA has failed to perform its nondiscretionary duty under 40 C.F.R. section 60.27(b) to review and respond, within four months of the May 30, 2017 state plan submission deadline (that is, by September 30, 2017), to state plans then submitted. Plaintiffs request that this Court order EPA to respond to those submissions, and any other already submitted state plans, within thirty (30) days of the Court's order.

Thirty days is eminently reasonable. To Plaintiffs' knowledge, EPA currently has only four submitted plans to review (California, New Mexico, Arizona, and West Virginia). It has had two of them—the California and New Mexico plans—for over a year and a half. And none of these plans are lengthy documents. Arizona's plan, for instance, is only 25 pages long. *See* Ex. 10, Arizona State Plan.[15] After it discusses Arizona's authority to enforce the standards and provides an inventory of covered Arizona landfills, that plan "incorporates by reference the federal standard." *Id*. at 16. New Mexico's plan is 22 pages long, and it similarly "incorporates by reference the allowable emission rates, compliance, control plan requirements, actual and allowable emissions, monitoring and testing requirements, recordkeeping and reporting requirements, and control schedules required in Subpart Cf." Ex. 11, New Mexico State Plan at 5.[16] California's plan is only 20 pages long. *See* Ex. 12, California State Plan.[17] Thirty days is adequate time for EPA to review and approve or disapprove these plans. Indeed, the agency has already conceded liability and so could begin these reviews now if it would like even more time to complete these required actions.

---

[15] Also available at http://static.azdeq.gov/aqd/msw_sp.pdf (last accessed Jan. 16, 2019).
[16] Also available at https://www.env.nm.gov/wp-content/uploads/2017/04/Exhibits-5-and-11-Proposed-State-Plan.pdf (last accessed Jan. 17, 2019).
[17] Also available at https://www.arb.ca.gov/cc/landfills/docs/stateplan/stateplanfinal.pdf (last accessed Jan. 16, 2019).

### 3. EPA Should Be Ordered to Promulgate a Federal Plan Within Five Months

EPA has also failed to perform its nondiscretionary duty under 40 C.F.R. section 60.27(d) to promulgate, within six months of the May 30, 2017 state plan submission deadline (that is, by November 30, 2017), a federal plan for those states that did not timely submit a plan. Although EPA has already exceeded that deadline by nearly 14 months, Plaintiffs recognize the practical reality that EPA's failure cannot be corrected instantaneously. Plaintiffs therefore request that the Court order EPA to perform this duty within five months of entry of the Court's order. (In accordance with the regulations, where a state submits a state plan prior to EPA's promulgation of a federal plan, EPA may forgo a federal plan if it determines the state plan is approvable. 40 C.F.R. § 60.27(d).)

The five months Plaintiffs request for EPA to issue a federal plan is eminently reasonable. Had EPA *not* violated its obligations, it would have had six months from the date state plans were due to promulgate a federal plan. Instead, under Plaintiffs' requested schedule, EPA will have at least 28 months from the May 30, 2017 state plan submission deadline. Moreover, EPA does not develop a unique federal plan for each state without an approvable plan; it develops *one* federal plan. The existing federal plan, codified at 40 C.F.R. Part 62, Subpart GGG, contains no provisions explicitly referencing any particular state, and speaks only of "designated facilities" generically. The *new* federal plan would likely only need to modify the *existing* federal plan to incorporate the lower thresholds for control mandated in the Emission Guidelines. Moreover, the regulatory text contained in the Emission Guidelines sets out in detail the provisions that a plan must include and would likely be the basis for any federal plan. *See, e.g.*, Emission Guidelines at 59,315 (section 60.34f titled "Operational standards for collection and control systems" states: "For approval, a state plan must include provisions for the operational standards in this section," and then lays out the specific things a state must require an owner or operator to do); *see also* 64 Fed. Reg. 60,689, 60,700 (Nov. 8, 1999) (explaining that the federal plan to implement the 1996 emission guidelines contains the same standards and requirements laid out in the 1996 guidelines).

1    Five months is sufficient time to propose that single plan, receive comment on it, and

2    finalize it. Once again, should the agency begin developing the federal plan right now, it would

3    have even more time to complete this action.

4              **4.     EPA Should Be Ordered to Respond to Any Future State Plans
                       Within Sixty Days of Submission**

5

6         Plaintiffs further request that the Court order EPA to respond to any future state plan

7    submissions within two months. This is also reasonable. Many states did not submit plans by the

8    deadline because EPA affirmatively encouraged them not to. *See, e.g.*, Stay Opp. at 5; *supra*, note

9    14. Should any state submit a plan, this Court should require EPA to quickly review and

10   determine if it is approvable. Two months is sufficient time to do so. In fact, EPA has already

11   received a number of draft plans from states; should these states submit these or similar drafts as

12   final plans, EPA will have already had an opportunity to review them. Notably, where EPA

13   provided comments on these drafts (prior to deciding it would not implement the Guidelines), the

14   comments were quite brief, suggesting that EPA's review process will not be lengthy or

15   complicated.[18]

16        To the extent EPA believes it must provide additional technical guidance to states to

17   implement the Emission Guidelines, it has a head start there as well. In February 2017, three

18   months prior to the deadline for state plans, EPA developed draft technical guidance. *See* Weaver

19   Decl., Ex. E, *Draft Technical Guidance for Implementing Emission Guidelines for Municipal*

20   *Solid Waste Landfills* (Feb. 13, 2017). Nor is it unusual for EPA to review state plans while

21   developing a federal one. Indeed, the usual regulatory timeline contemplates such overlap—EPA

22   must decide whether state plans are "approvable" within four months after the plan submission

23   deadline and must promulgate a federal plan within six months after the plan submission

---

24   [18] For example, EPA's two short comments on Alabama's draft plan comprised less than a half
     page of text. *See* Weaver Decl., Ex. B, Enclosure B to Letter from Beverly Spagg, Chief, Air

25   Enforcement and Toxics Branch, EPA, to Ron Gore, Director, Ala. Dep't of Envtl. Mgmt. (Mar.
     10, 2017). Similarly, EPA's two short comments on Florida's draft plan also comprised a half

26   page of text. *See id.*, Ex. C, Enclosure A to Letter from Beverly Spagg, Chief, Air Enforcement
     and Toxics Branch, EPA, to Preston McLane, Deputy Director, Division of Air Resource Mgmt.,

27   Florida Dep't of Envtl. Protection (May 4, 2017). EPA deemed many of its comments on North
     Dakota's draft plan "negligible." *See id.*, Ex. D, Email from Gregory Lohrke, U.S. EPA Region 8,

28   to T. Bachman, North Dakota (Mar. 8, 2017).

                                            21

1    deadline. 40 C.F.R. § 60.27(b), (d). Moreover, in both the ordinary course and Plaintiffs'

2    requested remedy, even after EPA promulgates a federal plan, nothing precludes a state from

3    submitting its own plan; as soon as EPA approves the state plan, that plan supplants the federal

4    plan. *Id.* § 60.27(d).

5              **5.    EPA Should Be Ordered to File Status Reports Every Sixty Days**

6         Plaintiffs further request that EPA be required to file status reports with this Court every

7    sixty (60) days detailing EPA's progress in complying with this Court's order, including state

8    plan submissions it has received, the status of EPA's review of and response to those

9    submissions, and the status of the development of a federal plan. The Court should require EPA

10   to file the first status report sixty (60) days after the date of the Court's order. Without such

11   updates, Plaintiffs will need to expend significant resources to monitor EPA's compliance with

12   the Court's order.

13   **IX.   CONCLUSION**

14        For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs'

15   Motion for Summary Judgment, declare that EPA has violated the Clean Air Act, and order EPA

16   to (1) respond to already submitted plans within thirty (30) days of this Court's order;

17   (2) promulgate a federal plan within five months of this Court's order; (3) respond to any future

18   state plan submissions within sixty (60) days after receiving them; and (4) file status reports every

19   sixty (60) days.

20

21   Dated:  January 22, 2019                          Respectfully Submitted,

22                                                     XAVIER BECERRA
                                                       Attorney General of California
23                                                     GARY E. TAVETIAN
                                                       DAVID A. ZONANA
24                                                     Supervising Deputy Attorneys General
                                                       TIMOTHY E. SULLIVAN
25                                                     JULIA K. FORGIE

26                                                     */s/ Elizabeth B. Rumsey*
                                                       ELIZABETH B. RUMSEY
27                                                     Deputy Attorneys General
                                                       *Attorneys for the State of California, by and*
28                                                     *through Attorney General Xavier Becerra*
                                                       *and the California Air Resources Board*

PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT (4:18-cv-03237-HSG)

1

2   TOMÁS CARBONELL*                            /s/ Susannah L. Weaver
    Environmental Defense Fund                  SUSANNAH L. WEAVER*
3   1875 Conn. Avenue, N.W. Suite 600          Donahue, Goldberg & Weaver, LLP
    Washington, D.C. 20009                      1008 Pennsylvania Avenue SE
4   Telephone: (202) 572-3610                   Washington, DC 20003
    tcarbonell@edf.org                          Telephone: (202) 569-3818
5                                               susannah@donahuegoldberg.com

6   ALEX GEORGE HANAFI (CA SBN 200418)         PETER ZALZAL*
    Environmental Defense Fund                  RACHEL FULLMER*
7   123 Mission Street                          Environmental Defense Fund
    San Francisco, CA 94105                     2060 Broadway, Suite 300
    Telephone: (202) 572-3260                   Boulder, CO 80302
8   ahanafi@edf.org                             Telephone: (303) 447-7214
                                                pzalzal@edf.org
9                                               rfullmer@edf.org

10                                              *Attorneys for Environmental Defense Fund*

11

12  For the State of Illinois                   For the State of Maryland
    KWAME RAOUL                                 BRIAN E. FROSH
13  Attorney General of Illinois                Attorney General of Maryland
    DANIEL I. ROTTENBERG*                       LEAH J. TULIN*
14  Assistant Attorney General                  Assistant Attorney General
    Environmental Bureau                        200 St. Paul Place
15  Illinois Attorney General's Office          Baltimore, Maryland 21202
    69 W. Washington St., 18th Floor            (410) 576-6962
16  Chicago, Illinois 60602                     ltulin@oag.state.md.us
    (312) 814-3816
17  DRottenberg@atg.state.il.us

18                                              For the State of Oregon
                                                ELLEN F. ROSENBLUM
19  For the State of New Mexico                 Attorney General of Oregon
    HECTOR BALDERAS                             PAUL GARRAHAN*
20  Attorney General of New Mexico              Attorney-in-Charge
    ARI BIERNOFF (CA SBN 231818)               Natural Resources Section
21  BILL GRANTHAM*                              Oregon Department of Justice
    Assistant Attorney General                  1162 Court Street, N.E.
22  201 Third Street NW, Suite 300             Salem, Oregon 97301-4096
    Albuquerque, New Mexico 87102              (503) 947-4342
23  (505) 717-3520                             paul.garrahan@doj.state.or.us
    wgrantham@nmag.gov

24

25  (*Continued on following page*)

26

27

28

23

1
For the Commonwealth of Pennsylvania
JOSH SHAPIRO

2
Attorney General of Pennsylvania
MICHAEL J. FISCHER*

3
Chief Deputy Attorney General
ROBERT A. REILEY

4
Assistant Director, Pennsylvania Department
of Environmental Protection

5
Pennsylvania Office of Attorney General
Strawberry Square

6
Harrisburg, PA 17120
(215) 560-2171

7
mfischer@attorneygeneral.gov

8

9
For the State of Vermont
THOMAS J. DONOVAN, JR.

10
Attorney General of Vermont
NICHOLAS F. PERSAMPIERI*

11
Assistant Attorney General
Office of the Vermont Attorney General

12
109 State Street
Montpelier, Vermont 05609

13
(802) 828-3186
nick.persampieri@vermont.gov

14

15
*Admitted to practice *pro hac vice*

16

17

18

19

20

21

22

23

24

25

26

27

28

For the State of Rhode Island
PETER NERONHA
Attorney General of Rhode Island
GREGORY S.SCHULTZ
Special Assistant Attorney General
RI Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
gschultz@riag.ri.gov

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28