UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 18-cv-03237-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 87, 92 |

Pending before the Court are cross-motions for summary judgment filed by Plaintiffs[1] and Defendants U.S. Environmental Protection Agency and Andrew R. Wheeler,[2] in his official capacity as Acting Administrator of the U.S. Environmental Protection Agency (collectively, "EPA"), briefing for which is complete. Dkt. Nos. 87 ("Pls.' Mot."), 92 ("Defs.' Mot."), 93 ("Pls.' Reply"), 94 ("Defs.' Reply"). The parties agree there is no dispute that EPA failed to fulfill certain mandatory duties under 40 C.F.R. § 60.27. *See* Dkt. No. 58. The only questions before the Court is whether Plaintiffs have standing and, if so, how long to give EPA to comply with its long-overdue nondiscretionary duties.

//

//

---

[1] Plaintiffs are eight states: the State of California, by and through the Attorney General and the California Air Resources Board; the State of Illinois; the State of Maryland; the State of New Mexico; the State of Oregon; the Commonwealth of Pennsylvania; the State of Rhode Island; and the State of Vermont. Dkt. No. 1 ¶¶ 1, 10–18. Plaintiffs also include the Environmental Defense Fund ("EDF"), which the Court permitted to intervene on November 20, 2018. *See* Dkt. No. 78. EDF has represented to the Court that it only intends to proceed in this action under the existing complaint filed by the States. *See* Dkt. No. 78 at 7 n.3.

[2] Acting Administrator Wheeler is automatically substituted for former Administrator Scott Pruitt. *See* Fed. R. Civ. P. 25(d).

## I. BACKGROUND

### A. Landfill Emissions

The relevant facts in this case are not in dispute. "The United States produces roughly 265 million tons of solid waste annually, or 4.5 pounds per person, per day . . . ." Dkt. No. 1 ("Compl.") ¶ 27; Dkt. No. 91 ("Answer") ¶ 27. Emitted from solid waste landfills are numerous harmful pollutants, including not only greenhouse gases but also "nearly thirty different organic hazardous air pollutants," which "present a range of public health and safety concerns." Compl. ¶¶ 28, 36; Answer ¶¶ 28, 36. These hazardous air pollutants "are known to cause adverse health effects . . . including heart attacks, asthma, and acute bronchitis leading to premature mortality." Compl. ¶ 36; Answer ¶ 36.

One such greenhouse gas is methane, a potent pollutant and the leading greenhouse gas behind carbon dioxide, which—along with other human-generated greenhouse gases—is "a significant driver of observed climate change." Compl. ¶¶ 2, 29; Answer ¶¶ 2, 29. Municipal solid waste landfills in particular "are the third-largest source of [domestic] human-related methane emissions." Compl. ¶ 29; Answer ¶ 29.

### B. Landfill Emission Regulations

The Clean Air Act ("CAA" or the "Act") "protect[s] and enhance[s] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).[3] To that end, the Act directs the EPA Administrator to "publish . . . a list of categories of stationary sources" that "in [the Administrator's] judgment . . . cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A). Once the agency includes a category of stationary sources in the list, the agency must "publish proposed regulations, establishing Federal standards of performance" for emission of pollutants from new or modified sources "within such category." *Id.* § 7411(b)(1)(B); *see also id.* § 7411(a)(2).

As relevant here, the Act also requires the regulation of "existing sources" that fall within

---

[3] All statutory citations are to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, unless otherwise stated.

2

the same category, provided that the emissions are not already covered by certain other CAA programs. *See id.* § 7411(d). Specifically, the CAA states that "[t]he Administrator shall prescribe regulations which shall establish a procedure similar to that provided by section 7410 of this title under which each State shall submit to the Administrator a plan [that] establishes standards of performance," and "provides for the implementation and enforcement of such standards of performance." *Id.* § 7411(d)(1). The Act further provides that the Administrator has authority to promulgate a federal implementation plan "in cases where [a] State fails to submit a satisfactory plan." *Id.* § 7411(d)(2); *see also id.* § 7410(c).

Consistent with the CAA's instruction, EPA promulgated regulations, which established deadlines for the implementation of emission guidelines. According to the regulations, once EPA published an emission guideline, each State to which the guideline pertained was required to "adopt and submit to the Administrator . . . a plan" to implement the guideline "[w]ithin nine months." 40 C.F.R. § 60.23(a). The agency then was required to "approve or disapprove" such implementation plans "within four months after the date required for submission of a plan or plan revision." *Id.* § 60.27(b). Last, if states to which the guideline pertained did not submit an implementation plan or EPA disapproved of a submitted plan, the Administrator was required, "within six months after the date required for submission of a plan or plan revision, [to] promulgate [a federal plan]" to implement the guideline. *Id.* § 60.27(d).

On August 29, 2016, EPA promulgated a final rule related to Municipal Solid Waste ("MSW") landfills. *Emission Guidelines and Compliance Times for Municipal Solid Waste Landfills*, 81 Fed. Reg. 59,276 (Aug. 29, 2016) ("Landfill Emissions Guidelines"). The Landfill Emissions Guidelines were the result of decades of consideration, as EPA first proposed rules regulating such emissions in 1991. Compl. ¶ 38; Answer ¶ 38. And in 1996, EPA promulgated landfill emission guidelines, which explained that landfill emissions are "a significant source of air pollution" and that the guidelines aimed to "significantly reduce landfill gas emissions, which have adverse effects on human health and welfare." *Standards of Performance for New Stationary Sources and Guidelines for Control of Existing Sources: Municipal Solid Waste Landfills*, 61 Fed. Reg. 9,905, 9,909, 9,918 (Mar. 12, 1996). The Administrator in particular determined "that

3

municipal solid waste landfills cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare." *Id.* at 9905.

The Landfill Emissions Guidelines became effective on October 28, 2016. In turn, according to EPA's regulations:

1. States were required to submit implementation plans by May 30, 2017, *see* 40 C.F.R. § 60.23(a)(1);
2. EPA was required to approve or disapprove submitted plans by September 30, 2017, *see* 40 C.F.R. § 60.27(b); and
3. If either (i) states to which the guideline pertained did not submit implementation plans, or (ii) EPA disapproved a submitted plan, then EPA was required to promulgate a federal plan by November 30, 2017, *see* 40 C.F.R. § 60.27(d).

As of May 30, 2017, EPA received implementation plans as described by the regulations from California and two from New Mexico—one covering Albuquerque and Bernalillo County and another covering the rest of New Mexico. Defs.' Mot. at 1–2 & n.2 (citing Dkt. No. 92-1 ("Lassiter Decl.") ¶ 15); *see also* Dkt. No. 58 ¶ 2. Subsequently, EPA received implementation plans from Arizona (one covering Maricopa County and another covering the remainder of the state), Delaware, and West Virginia. Defs.' Mot. at 1–2 & n.2 (citing Lassiter Decl. ¶ 15); *see also* Dkt. No. 58 ¶ 2. To date, EPA has neither approved or disapproved of any submitted plans nor promulgated a federal plan. Dkt. No. 58 ¶¶ 1–2. Accordingly, Plaintiffs brought this action, which asks this Court to "[i]ssue a declaratory judgment that, by failing to implement and enforce the Emission Guidelines, EPA has violated the Clean Air Act;" and "[i]ssue a mandatory injunction compelling EPA to implement and enforce the Emission Guidelines." Compl. at 19.

## II.    LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The parties agree that this case is properly resolved on their cross-motions for summary judgment. Pls.' Mot. at 1; Defs.' Mot. at 6. When there is no dispute that an agency failed to timely fulfill a nondiscretionary obligation, summary judgment is the appropriate mechanism to

4

determine when compliance is due. *See, e.g., In re Ozone Designation Litig.*, 286 F. Supp. 3d 1082, 1085 (N.D. Cal. 2018) (setting deadlines for EPA to comply with mandatory duties under the CAA at summary judgment). In those situations, courts generally have broad equitable discretion to fix an appropriate deadline. *See Nat. Res. Def. Council v. Sw. Marine, Inc.,* 236 F.3d 985, 999–1000 (9th Cir. 2000). That said, if Congress found that a certain amount of time was appropriate for the agency to complete its statutory duty in the first instance, that timeframe generally still controls. *Sierra Club v. Thomas,* 658 F. Supp. 165, 171 (N.D. Cal. 1987).

Courts should not, however, demand a deadline for agency compliance that is impossible or infeasible. *Nat. Res. Def. Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C. Cir. 1974) ("The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls for him to do an impossibility.") (internal quotation omitted). To determine whether a deadline is infeasible, the Court should consider: (1) whether the "budgetary" and "manpower demands" required are "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs"; and (2) an agency's need to have more time to sufficiently evaluate complex technical issues. *Id.* at 712–13. A delinquent agency, though, bears an "especially heavy" burden of showing infeasibility. *Thomas,* 658 F. Supp. at 172.[4]

## III. DISCUSSION

EPA admits that it has failed to meet its nondiscretionary obligations to implement the Landfill Emissions Guidelines, as compelled by the CAA. *See* Dkt. No. 58. For that reason, the Court enters the declaratory judgment of liability requested by Plaintiffs. *See* Compl. at 19(1). Plaintiffs also ask the Court to compel EPA immediately to perform its nondiscretionary duties under the Landfill Emissions Guidelines. *Id.* at 19(2).

EPA does not dispute that it has failed to perform its nondiscretionary duties. Dkt. No. 58 ¶¶ 1–2. Nor does it dispute that this Court has authority to "enter an order setting a deadline for

---

[4] Plaintiffs suggest that this Court should adopt an "impossibility" standard, rather than an "infeasibility" standard. Pls.' Reply at 12. Although courts have explained that agency officials should not be required to do the impossible, the Ninth Circuit does not appear to have held that courts should impose Plaintiffs' requested standard.

5

EPA to perform an obligation for which it admits liability." *See* Defs.' Mot. at 6. EPA argues, however, that (1) Plaintiffs lack standing, and (2) Plaintiffs' proposed deadlines are not feasible.

### A. State Plaintiffs Have Standing

EPA contends that neither the State Plaintiffs nor the intervenor-Plaintiff EDF have standing to sue. Because the Court finds the State Plaintiffs have standing, it need not evaluate whether EDF has standing. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."); *Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 951 (9th Cir. 2017) (declining to evaluate whether co-petitioners had standing).

#### 1. Legal Standard

A plaintiff seeking relief in federal court bears the burden of establishing the "irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). First, the plaintiff must have "suffered an injury in fact." *Spokeo*, 136 S. Ct. at 1547. This requires "an invasion of a legally protected interest" that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Second, the plaintiff's injury must be "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547. Third, the injury must be "likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61). "States are not normal litigants for the purposes of invoking federal jurisdiction" and are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007).

#### 2. Analysis

The Court finds the State Plaintiffs are entitled to "special solicitude" under *Massachusetts v. EPA*. The Supreme Court there held that Massachusetts had standing to contest EPA's decision not to regulate greenhouse-gas emissions that allegedly contributed to a rise in sea levels and a loss of coastal land. *Massachusetts v. EPA*, 549 U.S. at 526. It was "of considerable relevance" to the Court "that the party seeking review [was] a sovereign State and not . . . a private individual" because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* at

518. The Court then identified two other factors that entitled Massachusetts "to special solicitude in [the Court's] standing analysis." *Id.* at 520. The first was that the CAA created a procedural right to challenge EPA's conduct:

> The parties' dispute turns on the proper construction of a congressional statute, a question eminently suitable to resolution in federal court. Congress has moreover authorized this type of challenge to EPA action. That authorization is of critical importance to the standing inquiry: Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before. In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit. We will not, therefore, entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.

*Id.* at 516–17 (internal quotation marks and citations omitted). The second was that EPA's decision affected Massachusetts's "quasi-sovereign" interest in its territory:

> When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted.
>
> These sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable to the "emission of any air pollutant from any class or classes of new motor vehicle engines, which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."

*Id.* at 519–20 (citation omitted) (quoting 42 U.S.C. § 7521(a)(1)).

As was the case in *Massachusetts v. EPA*, the State Plaintiffs here "are not normal litigants" for purposes of federal jurisdiction. *Id.* at 518. And just as Congress afforded Massachusetts a right to challenge EPA's decision not to regulate greenhouse-gas emissions, Congress afforded the State Plaintiffs here the right to challenge EPA's failure to perform its nondiscretionary duties. *Compare id.* at 517 (finding the procedural right afforded under 42 U.S.C. § 7607(b)(1)), *with* 42 U.S.C. § 7604(a)(2) (affording the present procedural right).

Despite *Massachusetts v. EPA*'s clear applicability, EPA argues that the State Plaintiffs

7

lack standing for failure to plead causation, and relatedly, redressability. Defs.' Mot. at 9 ("[T]he States fail to demonstrate either a sufficient causal connection between EPA's inaction and the alleged injuries to the States' sovereign interests (fairly traceable) or the requested relief (redressability)."). To this end, EPA relies exclusively on *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013), in which the Ninth Circuit found the plaintiffs' alleged injuries were too attenuated to the climate change caused by the defendants' conduct to support causation. Defs.' Mot. at 10–11.

The Court finds EPA's reliance on *Bellon* unavailing. First, the *Bellon* Court explained that its holding was based on two factors: (1) plaintiffs there were not sovereigns; and (2) unlike in *Massachusetts v. EPA*, the plaintiffs did not provide evidence that the relevant emissions had a "meaningful contribution" on greenhouse-gas levels. 732 F.3d at 1145–46. Neither factor is present here. As detailed above, the parties do not dispute that the United States "produces roughly 265 million tons of solid waste annually," and that emissions from solid waste landfills contain numerous harmful pollutants. *See* Answer ¶ 27. And the parties do not dispute that solid waste landfills "are the third-largest source of [domestic] human-related methane emissions" and that methane is the leading greenhouse gas behind carbon dioxide. *Id.* ¶¶ 2, 29. Further, the Landfill Emissions Guidelines themselves—promulgated by EPA—detail the meaningful contribution of landfill emissions to harmful pollution. *See* 81 Fed. Reg. at 59,276–77. And the EPA Administrator long ago determined "that municipal solid waste landfills cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare." 61 Fed. Reg. at 9,905. "Where Congress has expressed the need for specific regulations relating to the environment, that expression supports an inference that there is a causal connection between the lack of those regulations and adverse environmental effects." *Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, at 1248 (9th Cir. 2008) (*NRDC*).[5]

For these reasons, the Court rejects EPA's causation challenge. The Court similarly rejects EPA's redressability challenge, which is entirely derivative of its causation challenge. *See* Defs.'

---

[5] EPA made no effort to distinguish *NRDC* in either the briefing or at the hearing on these motions.

8

Mot. at 12–13.

### B. Deadlines

Because the Court finds the State Plaintiffs have standing, the sole remaining issue is what timetable to impose on EPA for it to complete its long-overdue nondiscretionary duties. The parties each submitted proposed timetables. Plaintiffs request "strict guidelines," including that EPA be ordered to (1) review existing state plans within thirty days, (2) promulgate a federal plan within five months, (3) respond to any future state plans within sixty days of submission, and (4) file status reports every sixty days. Pls.' Mot. at 17–22. EPA requests (1) four to twelve months to review existing state plans, (2) twelve months to promulgate a federal plan, and (3) that the Court deny Plaintiffs' request for imposition of deadlines for future state plans. Defs.' Mot. at 17–25. In support of its timetables, EPA submits the Declaration of Penny Lassiter, the Acting Director of the Sector Policies and Programs Division within the Office of Air Quality Planning and Standards, Office of Air and Radiation at EPA. Lassiter Decl. ¶ 2.

As a preliminary matter, Plaintiffs argue that strict deadlines are warranted due to EPA's longstanding recalcitrance. Pls.' Mot. at 17–18. In Plaintiffs' view, "[a] court order setting specific and expeditious deadlines is needed to ensure EPA follows the law." *Id.* at 18. There is no denying EPA's clear failure to meet its nondiscretionary duties. But that alone does not dictate deadlines. The Court is now faced with the question of feasibility. And nothing about past recalcitrance in any practical sense changes the feasibility of timelines moving forward. To be sure, EPA's delinquency means that it has an "especially heavy" burden of showing infeasibility. *Thomas,* 658 F. Supp. at 172. But recalcitrance does not render feasible what is otherwise infeasible.

Plaintiffs also ask the Court to reject EPA's representation that it is short-staffed, because the President's recent budget request seeks to reduce EPA's funding. Pls.' Reply at 14. Again, this claim does not solve the issue at hand. As EPA notes, "the budget request is just that: the Executive's request to Congress." Defs.' Reply at 6. More important, that the President may seek to reduce EPA's future funding does not change EPA's present capabilities.

//

### 1. Existing State Plans

EPA received state plans from five states: California, New Mexico, Arizona, Delaware, and West Virginia. Lassiter Decl. ¶ 13. Two plans are in EPA Region 3: Delaware and West Virginia. *Id.* Two plans are in EPA Region 6: Albuquerque/Bernalillo County, New Mexico; and the rest of New Mexico. *Id.* Three plans are in EPA Region 9: Maricopa County, Arizona; the rest of Arizona; and California. *Id.*

Ms. Lassiter details five phases to the rulemaking process for state plan approval or disapproval: (1) review and analysis of submitted state plan; (2) development of rule proposal package; (3) proposed rule publication and public comment period; (4) summarization of comments, development of comment responses; and (5) development of final rule package. *Id.* ¶¶ 17–22. Ms. Lassiter provides a summary of the tasks necessary to complete each phase as well as an estimate of how long she estimates EPA will need to complete those tasks for each regional office, given that individual regional offices "review and approve or disapprove individual state plans." *Id.* ¶ 14. Each estimate purportedly represents the "minimum time" to complete a phase. *See id.* ¶ 10.

Plaintiffs argue that EPA needs no more than thirty days to review existing state plans, as most of the state plans are less than twenty-five pages and incorporate by reference federal standards. Pls.' Mot. at 19. EPA counters that Plaintiffs' thirty-day proposal "is patently unreasonable" because, among other things, "the required public notice and comment period and response to public comments cannot be completed in less than 45 days." Defs.' Mot. at 17. EPA adds that the presumptively reasonable timeframe is the four months afforded under the regulations. *Id.* And indeed, EPA proposes a four-month timeframe for completing its review of state plans outside of EPA Region 9.

EPA, however, proposes dramatically protracted deadlines for state plans from within EPA Region 9, without a satisfactory explanation. Ms. Lassiter claims that EPA Region 9 is "operating with seriously reduced resources; [has] a significant existing backlog of actions to complete; and [has] limited staff expertise in the MSW landfill source category." Lassiter Decl. ¶ 16. EPA adds that although California submitted a plan it considers "equivalent" to the relevant requirements

underlying the Landfill Emission Guidelines, EPA "anticipates that a line-by-line analysis will be necessary to determine" if that is true because California's existing program predates the relevant requirements. *Id.* EPA contends that these factors support an eight-month timeframe for the Arizona proposals and a twelve-month timeframe for the California proposal.

The Court takes EPA's representations about the phases required to conduct rulemaking for final action on state plans at face value and proceeds to analyze its proposed timetables on a phase-by-phase basis. In the review-and-analysis phase (Phase I), EPA Regions review the state plans "to determine whether [they] conform[] to the applicable statutory and regulatory requirements." Lassiter Decl. ¶ 18. EPA estimates that this phase will take fifteen days for state plans submitted in regions outside of EPA Region 9, thirty-five days for the Arizona plans, and sixty-five days for the California plan. *Id.* Tbls. 1–2. For the development of rule proposal package phase (Phase II), EPA performs some technical analysis, briefs the Regional EPA Administrator, and drafts regulatory text ultimately leading to a proposed rule. *Id.* ¶ 19. EPA uses a "tiering" approach at this phase, based on the complexity of the rulemaking actions, and concedes that the present "types of rulemakings" typically fall in the least complex category. *Id.* Nonetheless, EPA estimates that this phase will take thirty days for state plans submitted in regions outside of EPA Region 9, forty days for the Arizona plans, and seventy-five days for the California plan. *Id.* Tbls. 1–2. The next phase is the notice and comment period (Phase III), which is the ordinary period for public comment on the approval or disapproval of state plans. *Id.* ¶ 20. Publication in the Federal Register typically takes two weeks, after which the public comment period is thirty days. *Id.* EPA thus estimates that this phase will take forty-five days for all state plans. *Id.* Tbls. 1–2. Following notice and comment is the summarization of comment phase (Phase IV), wherein EPA "drafts a comment summary document." *Id.* ¶ 21. EPA estimates that this phase will take fifteen days for state plans submitted in regions outside of EPA Region 9, sixty days for the Arizona plans, and 120 days for the California plan. *Id.* Tbls. 1–2. Last is the final rule phase (Phase V), which includes briefing the Regional EPA management and producing the final regulatory package. *Id.* ¶ 22. EPA estimates that this phase will take fifteen days for state plans submitted in regions outside of EPA Region 9 and sixty days for the Arizona and

11

1 California plans. *Id.* Tbls. 1–2.

2 The Court begins by adopting the four-month deadline for state plans outside of EPA Region 9, which is the presumptively reasonable timeframe. Turning then to state plans within EPA Region 9, EPA has an "especially heavy" burden to prove that it is infeasible to approve or disapprove state plans in four months. *Thomas,* 658 F. Supp. at 172. The Court finds EPA has not met this burden.

Starting with Phase I, EPA's fifteen-day estimate for non-Region 9 plans seems imminently reasonable for the Region 9 plans as well. Although Ms. Lassiter claims that EPA may need to conduct a thorough review, including potentially a "line-by-line" analysis of California's plan, *see* Lassiter Decl. ¶ 16, the California plan is twenty pages long, *see* Dkt. No. 87-13. The Court sees no reason why even a line-by-line analysis of a twenty-page document requires sixty-five days, as EPA suggests.

As to Phase II, EPA only indicates that more time is needed in Region 9 because of "resource constraints" and "a backlog" of other work. Defs.' Mot. at 21. The Court finds two flaws in this explanation. First, these points are true for both the Arizona plans and the California plan, and yet EPA does not explain why it purportedly needs thirty-five *more* days for the California plan. Second, Ms. Lassiter concedes in her declaration that under EPA's "tiering" approach, the rulemaking actions at issue here fall within the least complex category of actions. Accepting that as true, the Court finds the thirty days EPA proposes for non-Region 9 state plans is reasonable across the board.

Turning next to Phase III, Plaintiffs contend that EPA could avoid a full-blown notice-and-comment process by approving the state plans with a "direct final rule," which would be effective "without requiring further notice." Pls.' Reply at 13 (citing *Approval and Promulgation of State Plans for Designated Facilities and Pollutants: California*, 64 Fed. Reg. 51,447, 51,447, 51,449–50 (Sept. 23, 1999)). As EPA responds, however, "it is not clear that [the discretionary direct final rule mechanism] is appropriate" and, more important, the exemplary direct final rule Plaintiffs cite states that the reception of adverse comments would render a direct final rule ineffective. Defs.' Reply at 2; *see also* 64 Fed. Reg. at 51,447 ("If EPA receives such comments, then it will publish

12

a timely withdrawal in the Federal Register informing the public that this rule will not take effect."). The Court thus finds it unreasonable to mandate that EPA employ the direct final rule mechanism.

As to Phase IV, EPA provides no explanation whatsoever for why it can complete the summarization phase for state plans outside of Region 9 in fifteen days, but needs *sixty* days for the Arizona plans and *120* days for the California plan. *See* Defs.' Mot. at 21 (stating summarily that "Phase IV . . . will take 60 and 120 days, for the Arizona plans and the California plan, respectively"). The Court finds that EPA has not met its "especially heavy" burden of demonstrating it needs more than fifteen days with such conclusory statements. *See Thomas,* 658 F. Supp. at 172.

Last, as to Phase V, EPA again provides no explanation whatsoever for why it can complete the final rule phase for state plans outside of Region 9 in fifteen days, but needs sixty days for the Arizona and California plans. *See* Defs.' Mot. at 21 ("For the same reasons, Phase V, development of final rule package, is estimated to take 60 days."). The Court again finds that EPA has not met its "especially heavy" burden of demonstrating it needs more than fifteen days with such conclusory statements. *See Thomas,* 658 F. Supp. at 172.

For these reasons, the Court adopts the four-month timetable EPA set forth for state plans outside of Region 9, but finds that EPA must meet the same timetable for plans within Region 9.

### 2. Federal Plan

Although the presumptively reasonable timeframe to promulgate a federal plan is six months—given the regulations—Plaintiffs argue that EPA needs no more than five months to propose a single federal plan, receive comments, and finalize it. Pls.' Mot. at 20–21. EPA counters that it needs twelve months—twice the regulatory timeframe. *See* Defs.' Mot. at 21–25. To this end, Ms. Lassiter details six phases to the rulemaking process for finalizing a federal plan, which are the same five phases described for action on state plans "plus a prefatory project kick-off phase." *Id.* at 21 (citing Lassiter Decl. ¶¶ 23–24). Ms. Lassiter again provides a summary of the tasks necessary to complete each phase as well as an estimate of how long she estimates EPA will need to complete those tasks. *Id.* ¶¶ 23–29.

13

United States District Court
Northern District of California

Although the Court takes EPA's representations about the phases required to conduct rulemaking for final action on a federal plan at face value, it rejects EPA's overall timetable for promulgation of a federal plan. Due to EPA's delinquency, it bears an "especially heavy" burden to prove that six months is infeasible. *See Thomas,* 658 F. Supp. at 172. Merely describing what tasks must be performed in the various phases as EPA does is thus unhelpful, as those steps presumably have always been required. It is EPA's burden to go beyond a description of the process and instead explain why it cannot complete the process within six months. And on this point EPA cites to only one factor: EPA staff members "with responsibility for rule writing" and the requisite knowledge and expertise "required for the development of a federal plan . . . are working on" other matters with court-ordered deadlines. Defs.' Mot. at 24–25 (citing Lassiter Decl. ¶¶ 10, 12); *see also Cmty. In-Power & Dev. Ass'n, Inc. v. Pruitt*, 304 F. Supp. 3d 212, 225 (D.D.C. 2018) (ordering EPA "to complete all nine overdue rulemakings no later than October 1, 2021"); *Blue Ridge Envtl. Def. League v. Pruitt*, 261 F. Supp. 3d 53, 61 (D.D.C. 2017) (ordering EPA "to complete RTRs [Risk and Technology Reviews] for at least 7 overdue source categories by December 31, 2018, and to complete the remaining 6 RTRs by June 30, 2020"); *Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 207 (D.D.C. 2017) (ordering EPA to perform overdue rulemaking as to "20 source category RTRs within three years"). Put differently, EPA seeks additional time to complete a nondiscretionary duty it failed to meet until ordered to act by the Court, because it faces other court orders to perform other unmet nondiscretionary duties. The Court finds EPA's self-inflicted inconvenience, by itself, does not satisfy the "especially heavy" burden necessary to warrant more than six months to promulgate a federal plan. *See Thomas,* 658 F. Supp. at 172.

### 3. Future State Plans

Plaintiffs finally ask this Court to "order EPA to respond to any future state plan submissions within two months." Pls.' Mot. at 21. Plaintiffs maintain that "[m]any states did not submit plans by the deadline because EPA affirmatively encouraged them not to," and thus "this Court should require EPA to quickly review and determine if [future plans are] approvable." *Id.* The EPA counters that this Court lacks jurisdiction to order EPA to take action based on future

14

plans because the "EPA has not yet missed any deadline to take final action on such plans." Defs.' Mot. at 25.

The Court finds that it does not yet have jurisdiction to order EPA to act based on as-yet-unmissed deadlines. As EPA notes, the CAA citizen suit provision under which Plaintiffs brought suit only vests jurisdiction in district courts "*after* EPA has failed to undertake some mandatory action prior to a certain deadline." *Id.* (quoting *Sierra Club v. Browner*, 130 F. Supp. 2d 78, 93 (D.D.C. 2001) and citing 42 U.S.C. § 7604(a)). In response, Plaintiffs cite to no authority to the contrary, but nonetheless urge this Court to exercise "close oversight in this matter," given that "EPA has shown that it has no intention of implementing the Emission Guidelines absent a specific court order, that it will implement them only in the narrowest way required, and that it will only fulfill additional mandatory obligations if it is hailed into court again." Pls.' Reply at 15 (internal citations omitted). Whether or not that characterization is accurate, the Court finds that the proper remedy given the jurisdiction-vesting statute is limited to compelling EPA to perform mandatory duties it has already failed to perform.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for summary judgment and enters judgment in favor of Plaintiffs and against Defendants. The terms of the judgment are as follows:

(1) The Court **DECLARES** that Defendants U.S. Environmental Protection Agency and Andrew R. Wheeler, in his official capacity as Acting Administrator of the U.S. Environmental Protection Agency, have failed to perform non-discretionary duties imposed by 40 C.F.R. § 60.27 to both (1) approve or disapprove existing state plans submitted to EPA addressing emission guidelines promulgated for municipal solid waste landfills within four months of receipt, and (2) promulgate regulations setting forth a federal plan addressing the emission guidelines promulgated for municipal solid waste landfills by November 30, 2017, both in violation of the Clean Air Act;

(2) The Court **ORDERS** Defendants to approve or disapprove of existing state plans, as required by 40 C.F.R. § 60.27(b), no later than September 6, 2019;

(3) The Court **ORDERS** Defendants to promulgate regulations setting forth a federal plan, as required by 40 C.F.R. § 60.27(d), no later than November 6, 2019;

(4) The Court **ORDERS** Defendants to file status reports with the Court every ninety days—such that the first status report is due August 5, 2019—detailing EPA's progress in complying with this order.

The Clerk is directed to enter judgment in favor of Plaintiffs and close the case. The Court retains jurisdiction to make such orders as may be necessary or appropriate.

**IT IS SO ORDERED.**

Dated: 5/6/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge